## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| FLORIDA RISING TOGETHER, INC. | CIVIL CASE NO. 6:24-cv-01682 |
| Plaintiff, | |
| v. | CHALLENGE TO THE CONSTITUTIONALITY OF FLORIDA STATUTE 97.053(6) |
| CORD BYRD, in his official capacity as Secretary of State for the State of Florida; ASHLEY MOODY, in her official capacity as Attorney General for the State of Florida; CHRISTINA WHITE, in her official capacity as Miami-Dade County Supervisor of Elections; JOE SCOTT, in his official capacity as Broward County Supervisor of Elections; GLEN GILZEAN, in his official capacity as Orange County Supervisor of Elections; and JERRY HOLLAND, in his official capacity as Duval County Supervisor of Elections, | DECLARATORY RELIEF REQUESTED   PERMANENT INJUNCTIVE RELIEF REQUESTED |
| Defendants. | |

## **COMPLAINT**

Plaintiff Florida Rising Together, Inc. ("Florida Rising" or "Plaintiff"), as an organization and on behalf of its members, by and through its undersigned attorneys, as and for its Complaint against Defendants, alleges as follows:

1

**INTRODUCTION**

1.      This action seeks declaratory and injunctive relief to stop an administrative policy employed by the Florida Department of State, Florida Attorney General, and Supervisors of Elections that creates an illegal precondition to voter registration that, if not enjoined, will unlawfully disenfranchise tens of thousands of eligible Florida voters, the vast majority of whom are people of color.

2.      Under Florida law, voter registration applications submitted by eligible voters are not added to the list of persons eligible to vote if certain identifying information input into the Florida Voter Registration System ("FVRS") by election officials does not produce an "exact match" with data maintained by the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") or the federal Social Security Administration.  Voter registration applicants whose information does not produce an "exact match" are not allowed to cast a ballot unless they overcome burdensome bureaucratic hurdles.  Those who do not provide the required information are deemed "unverified" and denied the right to vote.

3.      The "exact match" protocol is compounded by a legacy of historic and deliberate disenfranchisement and interacts with the effects of racial and economic discrimination in access to the ballot that continue to plague Florida. Taken together, the "exact match" protocol denies Black and other voters of color an equal opportunity to register to vote and participate in Florida's political process and is a

leading reason why voter registration applicants do not successfully make it onto Florida's voter rolls.

4.     Under Florida's "exact match" protocol, election officials must verify the authenticity or nonexistence of applicants' driver license or state identification number (collectively, "DLN"), or the last four digits of applicants' social security number ("SSN4") as applicable (collectively, Personal Identification Numbers, or "PIN").  The transposition of a single letter or number, deletion or addition of a hyphen or initial in an applicant's name, or the accidental entry of an extra character or space can cause a PIN number to be "unmatched" or not verified, even when the lack of verification is caused through no fault of the applicant.  The matching protocol is plagued with errors.  Mismatches can occur for a variety of reasons, including, data entry errors, typos, misread of imperfect handwriting by election officials, and computer glitches.

5.     Even though none of these common errors relate to a voter's fundamental eligibility to vote, they can lead to election officials improperly deeming *valid* voter registration applications to be invalid, incomplete, and "unverified," which renders eligible voters *presumptively ineligible* and denies them the right to vote.

6.     A determination that a voter registration application is incomplete or "unverified" due to a PIN-related issue can have severe consequences, shifting the

burden to the applicant to take onerous steps to provide PIN documentation.  If the applicant cannot provide this information before the election, the applicant risks not being able to vote at all or being relegated to voting a provisional ballot, which will not be counted unless the applicant "cures" the issue by providing the requested information to election officials no later than 5 p.m. on the second day following the election.  In practice, a substantial number of provisional ballots cast by otherwise eligible voters are not counted, resulting in the disenfranchisement of eligible voters.[1]

7.     Florida holds voter registration applicants to this strict "exact match" standard even though the matching protocol itself is prone to erroneous, inconsistent results.  In fact, the Social Security Administration ("SSA") Help America Vote Verification ("HAVV") database used to verify voter registration applicants' SSN4s, is widely known to routinely produce false and inconsistent results.  The error-prone nature of the SSA HAVV matching process was the subject of an evaluation by the office of the SSA's Inspector General, which found, among other things, that "HAVV's no-match response rate was 31 percent," that the "high no-match response rate … could hinder the States' ability to determine whether applicants should be

---

[1] This disparity is due in part to the costs attendant to "curing" a provisional ballot, which in Florida requires making a special trip to the local election supervisor's office after the election is over and after unofficial results are known—but only within a compressed two-day time frame (by 5:00 p.m. on the first Thursday after the election).

allowed to vote," and that "the HAVV program provided the States with responses that may have prevented eligible individuals from registering to vote and allowed ineligible individuals to vote."[2]

8.     The types of mistakes that are likely to lead to an "unmatched" PIN and be swept into the "exact match" verification process have resulted in at least tens of thousands of valid voter registration applications since 2018 being deemed "unverified" and eligible applicants not being permitted to vote.  Indeed, more than 43,000 individuals who submitted otherwise valid voter registration applications to Florida election officials since 2018 across 26 Florida counties have never been able to register to vote successfully solely due to the "exact match" requirement

9.     Critically, the verification issues and subsequent rejections of voter registration applications disproportionately impact Black registrants and other registrants of color.  Black voter registration applicants have been rejected or deemed "unverified" at a rate more than twice their share of the registrant pool for the counties analyzed, while white applicants are denied registration and deemed "unverified" at a small fraction of their share of the comparable electorate.

---

[2] Social Security Administration Office of the Inspector General, "Quick Evaluation Response: Accuracy of the Help America Vote Verification Program Responses," June 2009, *available at* https://oig-files.ssa.gov/audits/summary/29115.pdf.   The SSA Inspector General's report was issued after Florida modified its "exact match" protocol in 2008.

10.     Florida's voter registration "exact match" verification protocol, and its consequent disenfranchisement of eligible voters, violates Section 2 of the Voting Rights Act of 1965, the National Voter Registration Act of 1993 ("NVRA") and the First and Fourteenth Amendments to the United States Constitution.   These constitutional and statutory violations deprive tens of thousands of voters of the fundamental right to vote and require imposing appropriate declaratory and injunctive relief.

11.     Unless the Court grants the relief requested herein by Plaintiff, the "exact match" protocol will continue to have a discriminatory impact on Black citizens and other Florida citizens of color and will continue to impose severe burdens on eligible Floridians' fundamental right to vote.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as a case arising under the Constitution and laws of the United States; under 42 U.S.C. § 1983, as a case seeking to enforce rights and privileges secured by the Constitution and laws of the Unites States; and under 52 U.S.C. § 20510, which provides for jurisdiction of actions brought under the NVRA.

13.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201, 2202.

14.    This Court has personal jurisdiction over Defendants because they do business in, and are elected or appointed officers of, the State of Florida and counties within the State of Florida.

15.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 52 U.S.C. § 20510 because a substantial part of the events or omissions giving rise to the claims occurred in this district and/or the violations took place in this district.

## PARTIES

16.    Plaintiff Florida Rising is a nonprofit organization dedicated to advancing economic and racial justice across Florida by building power in historically marginalized communities.  As a 501(c)(3) organization with a mission to increase the voting and political power of marginalized people and excluded constituencies, Florida Rising conducts massive voter registration, voter education, voter engagement, and election protection programs in Florida.

17.    Florida Rising is a leading voice for racial justice and expanding democracy in Florida.  To that end, Florida Rising registers, educates, and empowers Floridians to organize in their own communities to advance equity and fairness across the state.  Florida Rising currently has more than 118,000 members nationwide.  More than 66,000 of Florida Rising's members currently reside in Florida.

18.    Florida Rising's members include individuals who have been impacted or may in the future be impacted by the "exact match" protocol.  These individuals are *eligible* voter registration applicants who, because of the "exact match" protocol, have had or will in the future have their facially complete voter registration forms deemed "unverified" and who, as a direct result of Defendants' "exact match" protocol, will not be registered to vote as active voters on the Florida voter-registration list for upcoming elections.

19.    Florida's "exact match" policy is forcing Florida Rising to divert resources to resolve related voter-registration problems for Floridians trying to register to vote.  This frustrates a core component of Florida Rising's mission by interfering with its ability to expand democracy in Florida. Some of the individuals who have had their voter registration applications held up or been unable to register successfully due to the exact match program were registered by Florida Rising or had been contacted by Florida Rising as part of their voter registration and get-out-the-vote work.

20.    For many years, Florida Rising has assisted voters who are confused about their voter registration status and adversely impacted due to the "exact match" requirements.  In light of the magnitude of the impact of Florida's "exact match" program, Florida Rising was forced to launch an outreach program designed specifically to contact individuals whose facially valid, timely voter registration

applications have been denied or placed in an "unverified" status due to a failure to meet the "exact match" requirements. Florida Rising staff and volunteers have, in connection with the program, been assisting impacted voter registration applicants to navigate the barrier to registration erected by the "exact match" process so that they can vote. Undertaking the program and responding to voter confusion about registration status that stems from the "exact match" requirements has required Florida Rising to deploy staff, volunteers, and other resources that would otherwise be devoted to the organization's core voter registration, voter education, and get-out-the-vote work.

21.    Defendant Cord Byrd is sued in his official capacity as the Secretary of State for the State of Florida.

22.    Defendant Ashley Moody is sued in her official capacity as the Attorney General for the State of Florida.

23.    Defendant Christina White is sued in her official capacity as the Miami-Dade County Supervisor of Elections.

24.    Defendant Joe Scott is sued in his official capacity as the Broward County Supervisor of Elections.

25.    Defendant Glen Gilzean is sued in his official capacity as the Orange County Supervisor of Elections.

26.     Defendant Jerry Holland is sued in his official capacity as the Duval County Supervisor of Elections.

27.     A copy of the notice letter advising Defendants of the NVRA violation described herein is attached as **Exhibit 1**.

## FACTS AND BACKGROUND

**A.      The Florida Constitution and Federal Law Set Forth Minimum Requirements for Voter Registration in Florida**

28.     Article VI, Section 2 of the Florida Constitution imposes only three eligibility requirements on Florida citizens before they are permitted to exercise their right to vote.  An individual is eligible to vote if he or she is: (1) a citizen of the United States; (2) at least 18 years old; and (3) a Florida permanent resident.

29.     Article VI, Section 4 of the Florida Constitution provides two narrow circumstances under which otherwise eligible persons may be disqualified from voting: (1) the person is convicted of a felony; or (2) the person is adjudicated to be mentally incompetent.

30.     The Help America Vote Act ("HAVA") requires the State of Florida to maintain a centralized, computerized, statewide voter registration database as the single system for storing and managing Florida's official list of registered voters.  52 U.S.C. § 21083(a)(1)(A).  Under HAVA, voter registration applicants who have been issued a current and valid driver license must provide their driver license

10

number on the application.  Applicants who lack a current driver license must provide the last four digits of their social security number.  If an applicant does not have either, the state must assign the applicant a unique identifier for voter registration purposes.  52 U.S.C. § 21083(a)(5)(A).

**B.     Florida's Statutory 'Exact Match' Requirements Impose Additional Requirements on Voter Registration Applicants that Involve an Error-Prone Matching Process**

31.    In Florida, voter registration applications may be submitted through multiple methods.  Fla. Stat. § 97.053(1).  These applications can be hand delivered or mailed to any Supervisor of Elections ("Supervisor"), the Department of State's Division of Elections, a driver license office, a voter registration agency, or an armed forces recruitment office, among other places.  Additionally, applicants may submit applications online.  Fla. Stat. § 97.0525.  Further, applicants may submit electronic applications through the DHSMV.  *See* Fla. Admin. Code ("FAC") 1S-2.039(5).

32.    A voter registration application is only complete when all information necessary to establish the applicant's eligibility is received by a voter registration official and the application is verified pursuant to the "exact match" requirements of Florida Statute § 97.053(6) (the "Exact Match Requirements").  Fla. Stat. § 97.053(2).

33.    Except in the case of applications submitted electronically through the DHSMV, Florida law requires that a voter registration application only be accepted

11

as valid after the Department of State has verified the authenticity of the PIN provided by the applicant, or the nonexistence of such PIN. *See* FAC 1S-2.039(5). Specifically, "a voter registration application may be accepted as valid only after the department has verified the authenticity or nonexistence of the driver license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant." Fla. Stat. § 97.053(6).[3]

34.     Election officials use an error-prone matching process to attempt to verify the authenticity of the applicant's PIN number. Fla. Stat. § 97.053(6).

35.     To do so, officials first enter the voter registration application information into the Florida Online Voter Registration Database. FAC § 1S-2039(4).

36.     Next, any valid application for registration that is complete and submitted, other than those submitted electronically through the DHSMV, is assessed for verification of the PIN number provided by the applicant. FAC § 1S-2.039(5).

---

[3] If an applicant does not provide a PIN and checks or writes "none" on the application, indicating that they do not have a PIN, the application is complete once voter registration officials have verified the nonexistence of a PIN. If voter registration officials determine that a PIN exists, the applicant is required to resolve the matter. If the applicant does not provide a PIN, or provides an incomplete PIN, and does not check or write "none" on the application, indicating that they do not have a PIN, the application is incomplete unless the applicant includes a copy of the driver license, state identification card, or the social security card from which the voter registration official can complete the incomplete PIN. FAC 1S-2.039(5)(b), (c).

37.     In the case of driver license or identification card PIN matching, the driver license or state ID card number contained on the voter registration application is transmitted to the DHSMV, and the DHSMV performs computerized searches of its Driver and Vehicle Information Database ("DAVID").  *Id.*

38.     In the case of SSN4 PIN matching, the applicant's information is transmitted to SSA for matching.  *Id.*

39.     As a result of this process, voter registration applications are classified as "Matched," "Possibly Matched," or "Unmatched."

40.     "Possibly Matched" and "Unmatched" results are routed to the Bureau of Voter Registration Services ("BVRS") for review by BVRS Staff.  FAC § 1S-2.039(5)(a).  BVRS staff use DAVID to attempt to resolve the records.  In reviewing the records for resolution, BVRS staff have access to a scanned image of the original voter registration application.  FAC §§ 1S-2.039(5)(a)(2).

41.     Based on the BVRS review, three outcomes are possible:

42.     First, if BVRS staff determines that a data entry error occurred, BVRS corrects the application record and re-submits the record to the DHSMV or SSA for verification.  FAC § 1S-2.039(5)(a)(2).

43.     Second, if BVRS determines that a data entry error did not occur, but BVRS is able to confirm that the PIN belongs to the applicant, BVRS overrides

Florida Voter Registration System to complete the registration process for that applicant.

44.    Finally, if BVRS is still unable to verify an application record, the record is sent to the Supervisor in the applicant's home county for further action. FAC § 1S-2.039(5)(a)(3).

### C.    Eligible Voters Whose Applications Do Not Meet Florida's 'Exact Match' Requirements Are Disenfranchised

45.    If a PIN is classified as "Unmatched," the related voter registration application is deemed incomplete and a letter is mailed to the applicant to notify them.

46.    In Miami-Dade County alone, since 2018, over 41,000 applications were set aside as "unverified" and flagged for further action by the applicant due to a PIN mismatch, with the applicants being sent letters by county election officials. According to elected officials' own records, these "unverified" voter registration applications are valid aside from failing to comply with the "exact match" protocol. Attached hereto as **Exhibit 2** is the letter template used by Miami-Dade County to inform applicants that the validity of their PIN could not be verified.

47.    Once an applicant is notified of the "incomplete" status of his or her application, the burden shifts to the applicant to provide evidence to the Supervisor

that is sufficient to verify the authenticity of the PIN ("PIN Verification Evidence").
§ 97.053(6).

48.     If the applicant provides the PIN Verification Evidence to the Supervisor prior to the book-closing date for the election, the Supervisor places the applicant's name on the registration rolls as an active voter.  *Id.*

49.     If the applicant is not able to provide the PIN Verification Evidence to the Supervisor before presenting himself or herself to vote, the applicant is "unverified" and is only permitted to vote a provisional ballot.  *Id.*

50.     Importantly, provisional ballots are only counted if the applicant provides the required PIN Verification Evidence to the Supervisor by 5:00 p.m. on the second day following the election.  *Id.*  In practice, as indicated in **Exhibit 3**, voters are often informed that their provisional ballots have not been counted.

51.     Several voters in Miami-Dade County, for example, had their provisional ballots rejected during the 2022 general election due to the county's inability to verify their PINs through the "exact match" protocol.

52.     The "exact match" process leads to the disenfranchisement of eligible Florida citizens who would otherwise be able to vote without restriction pursuant to state law and would have been able to cast regular ballots that would have been counted.

53.     Florida's "exact match" verification protocol also takes time to execute from beginning to end.  The time lag can sow confusion and leave voter registration applicants uncertain about their eligibility to vote in the time leading up to, on, and even after Election Day.

**D.     Florida's 'Exact Match' Requirements Disproportionately Impact Black Applicants and Other Voter Applicants of Color**

54.     The magnitude of the detrimental impact of Florida's "exact match" program is immense.

55.     More than 43,000 individuals who submitted otherwise valid voter registration applications to Florida election officials since 2018 were never able to register to vote successfully solely due to the "exact match" requirement.[4]

56.     Those approximately 43,000 unsuccessful registrants sought to vote in 26 Florida counties: Alachua, Brevard, Broward, Clay, Collier, Columbia, Duval,

---

[4] These more than 43,000 applications were rejected solely due to one of two reason codes: 611 (driver license mismatch) or 612 (SSN4 mismatch).  Additional applications were rejected for another reason or a combination of reasons.  This number is the product of Plaintiff's investigation to date, which is based on incomplete information that captures only a subset—and perhaps a small subset—of the total number of voters who have actually been impacted by Florida's "exact match" program over the years.  It does not include registrants who were flagged as "unverified" by the "exact match" program but were subsequently able to cure and make it onto the voter rolls.  It is also limited to 26 Florida counties and by time period.  For most of the 26 counties, voter records were only received going back to 2023.  Plaintiff submitted written requests to the Florida Department of State to obtain the full list of voter registration applicants who have not made it into the voter rolls due to the State's "exact match" protocol on May 3, 2024, and again on July 23, 2024.  *See* Exhibit 1.  Those requests were based on the NVRA's public disclosure provision and Florida's Sunshine Law.  Plaintiff has yet to receive the records requested.  Plaintiff has conferred with the State, and continues to confer with the State, to obtain the records.

Escambia, Hillsborough, Lake, Lee, Leon, Levy, Manatee, Marion, Martin, Miami-Dade, Orange, Osceola, Palm Beach, Pasco, Pinellas, Sarasota, Seminole, Sumter, and Volusia counties.

57.    As of August 1, 2024, these 26 counties were home to 13,045,645 (81.1%) of Florida's 16,083,667 registered voters.

58.    More than 17,000 of the aforementioned 43,000 unsuccessful registrants (due to a mismatched DLN or SSN4) submitted their applications since January 1, 2022.

59.    The "exact match" requirement is the leading reason why voter registration applicants do not successfully make it onto Florida voter rolls.

60.    Black voters and other voters of color in Florida face a significantly higher risk of having their voting registration applications denied or placed in "unverified" status due to a purportedly incorrect PIN when compared to their white counterparts.

61.    Black citizens account for approximately 14% of registered voters across the 26 counties, according to the August 1, 2024, Florida registered voter file. By contrast, more than 31% of the applications denied or deemed "unverified" for an incorrect PIN since January 1, 2022 in those 26 counties were submitted by Black applicants.

17

62.     White citizens account for approximately 57% of registered voters across the same 26 counties, according to the August 1, 2024, Florida registered voter file.   By contrast, approximately 7% of the applications denied or deemed "unverified" for an incorrect PIN during the same time period were submitted by white applicants.

63.     Table 1 reflects the stark racial disparity of the "exact match" program's impact:

**TABLE 1**

| Percentage of Applications Rejected or Deemed 'Unverified' for Incorrect Driver License Number and SSN4, by Race across 26 Counties (Data from 2022-2024)[5] | | |
|---|---|---|
| **Race** | **Percentage of Registered Voters in 26 Counties** | **Percentage of Applications Rejected or 'Unverified' Due to Incorrect PIN** |
| Black | 14.3% | 31.5% |
| White | 56.9% | 7.1% |

64.     Although stark racial disparities are consistent across the 26 counties, a closer look at data from four of Florida's most heavily populated counties—Broward, Duval, Miami-Dade, and Orange—between 2018 and 2023 demonstrate the breadth and the depth of the impact wrought by the "exact match" program.

---

[5] The percentages stated in Table 1 are subject to changes in the number of registered voters at any given time.

**TABLE 2**

| Percentage of Applications Rejected or Deemed 'Unverified' for Incorrect Driver License Number and SSN4, by Race (data from 2018-2023)[6] | | | |
|---|---|---|---|
| County | Percentage of Registered Voters in County | Percentage of Applications Rejected or 'Unverified' Due to Incorrect SSN4 | Percentage of Applications Rejected or 'Unverified' Due to Incorrect DLN |
| **Miami-Dade** | | | |
| Black | 15% | 40% | 30% |
| White | 17% | 4% | 5% |
| **Broward** | | | |
| Black | 25% | 45% | 35% |
| White | 40% | 10% | 14% |
| **Orange** | | | |
| Black | 17% | 20% | 25% |
| White | 44% | 4% | 9% |
| **Duval** | | | |
| Black | 28% | 44% | 35% |
| White | 56% | 10% | 15% |

65.    Specifically, in Miami-Dade County, data from 2018-2023 shows that applications from Black citizens, who constitute approximately 15% of registered voters, represent approximately 30% of those denied or deemed "unverified" for an incorrect DLN, and approximately 40% of those denied or deemed "unverified" for an incorrect SSN4.

---

[6] The percentages stated in Table 2 are subject to change due to changes in the number of registered voters at any given time.

66. Meanwhile, applications from white voters, who constitute approximately 17% of the electorate in Miami-Dade County, represent approximately 5% of the applications denied or deemed "unverified" for an incorrect DLN and approximately 4% of those denied or deemed "unverified" for an incorrect SSN4 over the same time period.

67. In Broward County, data from 2018-2023 shows that applications from Black citizens, who constitute approximately 25% of registered voters, represent approximately 35% of those denied or deemed "unverified" for an incorrect DLN, and approximately 45% of those denied or deemed "unverified" for an incorrect SSN4.

68. Meanwhile, applications from white voters, who constitute approximately 40% of the electorate in Broward County, represent approximately 14% of the applications denied or deemed "unverified" for an incorrect DLN and approximately 10% of those denied or deemed "unverified" for an incorrect SSN4 during the same time period.

69. In Orange County, data from 2018-2023 show that applications from Black citizens, who constitute approximately 17% of registered voters, represent approximately 25% of those denied or deemed "unverified" for an incorrect DLN, and approximately 20% of those denied or deemed "unverified" for an incorrect SSN4.

70.     Further, in Orange County, over the same time period, applications from Hispanic citizens, who constitute approximately 26% of registered voters, represent approximately 46% of those denied or deemed "unverified" for an incorrect SSN4.

71.     Meanwhile, applications from white voters, who constitute approximately 44% of the electorate in Orange County, represent approximately 9% of the applications denied or deemed "unverified" for an incorrect DLN and approximately 4% of those denied or deemed "unverified" for an incorrect SSN4 during that time period.

72.     In Duval County, data from 2018-2023 shows that applications from Black citizens, who constitute approximately 28% of registered voters, represent approximately 35% of those denied or deemed "unverified" for an incorrect DLN, and approximately 44% of those denied or deemed "unverified" for an incorrect SSN4.

73.     Meanwhile, applications from white voters, who constitute approximately 56% of the electorate in Duval County, represent approximately 15% of the applications denied or deemed "unverified" for an incorrect DLN and approximately 10% of those denied or deemed "unverified" for an incorrect SSN4 during that time period.

74.    Given the data from these counties, the overall population of these counties, and the substantial percentage of the Florida electorate that these counties represent, Florida's "exact match" protocol adversely impacts large numbers of otherwise eligible voter registration applicants statewide, with a disparate and discriminatory impact on Black citizens and other citizens of color.

**E.    The Disparate Impact the 'Exact Match' Requirements Have on Black Citizens and Other Citizens of Color is the Continuing Legacy of Racial Discrimination in Florida**

75.    Florida's voter registration protocols work in concert with Florida's history of racial discrimination, particularly its official voting-related discrimination, the legacy and effects of which continue to impact the opportunity for Black citizens and other citizens of color to register to vote and to participate in the political process.

76.    The U.S. Commission on Civil Rights highlighted the disproportionate disenfranchisement of Black voters in Florida in the 2000 presidential election.  In addition, in the 2012 and 2016 presidential elections, data show that Black voters were at least twice as likely as white voters to have their ballot rejected or deemed "unverified."  Further, data from 2020 shows that Black voters disproportionately had their mail ballots rejected or deemed "unverified" due to missing or mismatched signatures.  As recently as 2022, polling-place closures in predominantly Black neighborhoods burdened Black voters, restricting their voting options.  In addition,

data show that for all voting-eligible adults in the 2022 elections in Florida, Black adults were disenfranchised at a rate nearly *double* that of all Florida adults.

77.   Historical conditions and effects of racial discrimination in Florida make it more difficult for Black and other citizens of color to navigate the requirements and bureaucratic hurdles associated with Florida's "exact match" protocol.

78.   The disparities outlined here reflect racial disparities beyond voting—disparities that are perpetuated by the inability of eligible Black voters and other eligible voters of color to participate at the polls at the same rate as others.  With respect to household incomes, the 2022 American Community Survey ("ACS Survey") indicated that Black households in Florida earn a median income of approximately $50,000 as compared to approximately $74,000 for white households in Florida. The ACS Survey also indicated that Black residents in Florida live in poverty at a rate more than double that of white residents.  Black residents in Florida were also nearly twice as likely as white residents to lack a high school diploma.

**F.      Florida's 'Exact Match' Requirements Are Not Narrowly Drawn to Advance a Sufficiently Compelling State Interest and Are Unduly Burdensome**

79.   Florida's "exact match" protocol, in practice, imposes a severe and unequal burden on Floridians' fundamental right to vote.  The discriminatory and disproportionate effects of the "exact match" protocol demonstrate it is not narrowly

drawn to advance a sufficiently compelling state interest.  Rather, the burdens the protocol places on Florida citizens undermine any interest Plaintiff may allege. Given the unreliability of the data matching process, an unmatched PIN does not serve as a meaningful indicator that the applicant is not who they say they are, nor does it justify the State shifting the burden to the applicant to resolve the mismatch.

80.    Indeed, the State already has other tools that perform the function purportedly served by the "exact match" process.  These include other data-matching tools, implementation of memoranda of understanding with other agencies in Florida and in other states, and enforcement of Florida's numerous criminal statutes prohibiting illegal registration and voting.  For example, under Florida law, a false affirmation on a voter registration application subjects an applicant to fines of up to $5,000 and incarceration of up to five years.

81.    Due to its inherent inaccuracy, the protocol disrupts the orderly administration and accurate record-keeping in Florida elections.  The "exact match" protocol erroneously prevents eligible voters from exercising their right to vote.  The disparate impact of Florida's registration requirements complicates orderly administration of elections.

82.    These complications and inaccuracies—a consequence of the poorly tailored "matching" protocol—undermine election integrity, thereby frustrating a legitimate state interest.  Considered in conjunction with the burdens that the

program imposes on voting by otherwise eligible citizens, the practical effect of the "exact match" protocol is to subvert public confidence in the integrity of elections.

## CLAIMS FOR RELIEF

### Count I
### Violation of the First and Fourteenth Amendments to the U.S. Constitution: Undue Burden on the Right to Vote

### 42 U.S.C. § 1983

83.    Plaintiff realleges and incorporates by reference paragraphs 1 through 82 of this Complaint as though fully set forth herein.

84.    The First and Fourteenth Amendments to the United States Constitution protect the right to vote as a fundamental right.  The First Amendment's guarantees of the freedoms of speech and association protect the right to vote and to participate in the political process.  The right to vote is a fundamental constitutional right also protected by both the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

85.    42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."

86.     Preventing applicants from registering to vote until certain application information exactly matches under Florida's "exact match" requirements imposes severe burdens on Floridians' fundamental right to vote.

87.     Because of the issues arising out of the "exact match" requirements, tens of thousands of otherwise valid voter registration applications have been denied, leaving many voters in an "unverified" status and unable to cast regular ballots.  In addition, to the extent a provisional ballot is cast, a significant number of voters fail to cure their provisional ballots after the fact, further disenfranchising eligible voters and undermining the electoral process.

88.     Although this process's burdens are undeniably severe, the burdens imposed by the poorly tailored "exact match" protocol cannot be justified regardless of the level of scrutiny applied.

89.     There is no indication that the "exact match" protocol for identifying applicants whose driver license or social security numbers fail to match information contained in a database has ever identified a single applicant who is actually ineligible to vote in Florida elections or that the "exact match" process increases voters' confidence in the integrity of Florida elections.

90.     None of the "exact match" protocol's onerous burdens are necessary to achieve, or are reasonably related to, any sufficiently weighty state interest.  There is no constitutionally adequate justification for Defendants, acting under color of state

law, to deprive Black voters and other voters of color of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

91.   Therefore, Defendants have violated, and continue to violate, the First and Fourteenth Amendments of the Constitution.

## Count II
## Violation of Section 8 of the National Voter Registration Act

### 52 U.S.C. § 20507(b)(1)

92.   Plaintiff realleges and incorporates by reference paragraphs 1 through 82 of this Complaint as though fully set forth herein.

93.   With respect to "[c]onfirmation of voter registration," Section 8 provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1).

94.   Florida's "exact match" program is neither uniform nor non-discriminatory, and it does not comply with the Voting Rights Act of 1965.

95.   In many Florida counties, Black voter registration applicants have been rejected or had their applications deemed "unverified" at a rate more than twice their share of the registrant pool, while white applicants are denied registration at a small fraction of their share of the electorate.

96.     Black citizens account for only 14% of registered voters across 26 of Florida's most populous counties.  In contrast, 30% of the registration applications denied or deemed "unverified" for an incorrect PIN between 2022 and early 2024 in those 26 counties were submitted by Black applicants.  Meanwhile, white citizens account for 57% of registered voters across the same 26 counties.  However, fewer than 10% of the registration applications denied or deemed "unverified" for an incorrect PIN during the same time period were submitted by white applicants.

97.     These disparate statistics demonstrate that Defendants do not conduct their voter registration activities in a manner that is "uniform" or "nondiscriminatory," and as such, do not "ensure the maintenance of an accurate and current voter registration roll for elections for Federal office[.]" 52 U.S.C. § 20507(b)(1).

98.     Therefore, Defendants have violated, and continue to violate, Section 8(b)(1) of the National Voter Registration Act.

### Count III
### Violation of Section 2 of the Voting Rights Act

### 52 U.S.C. §§ 10301 et seq.; 42 U.S.C. § 1983

99.     Plaintiff realleges and incorporates by reference paragraphs 1 through 82 of this Complaint as though fully set forth herein.

100.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 provides in relevant part that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group].

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to a nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(a)-(b).

101.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."

102.   The "exact match" requirements constitute a qualification or prerequisite to voting within the meaning of Section 2 of the Voting Rights Act, resulting in the denial or abridgment of Floridians' right to vote on account of their race or color in violation of Section 2.

103.   The "exact match" requirements impose a substantial, unwarranted, and disparate burden on Black and other voter-registration applicants of color and

Florida Rising's members and denies them an equal opportunity to register and to vote in Florida elections.

104.  The "exact match" requirements interact with historical, socioeconomic, and other electoral conditions in Florida to prevent Black applicants and other voter-registration applicants of color from having an equal opportunity to register and vote.  *See Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

105.  As a result of the "exact match" requirements, and under the totality of circumstances, the political process in Florida is not equally open to participation by Black and other voter registration applicants of color, insofar as they have less opportunity than other members of the Florida electorate to participate in the political process and to elect representatives of their choice.

106.  Therefore, Defendants maintenance of the "exact match" process violates Section 2 of the Voting Rights Act.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

107.  Enter judgment in favor of Plaintiff and against Defendants on the claims for relief as alleged in this Complaint;

108.  Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the Florida "exact match" voter registration protocol violates (a) the fundamental right to vote under the First and Fourteenth Amendments to the United

States Constitution, (b) Section 8 of the National Voter Registration Act of 1993, 52 U.S.C. § 20507, and (c) Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301;

109.    Grant Plaintiff preliminary or permanent injunctive relief by ordering that Defendants:

(a)    discontinue the practice of placing in "unverified" status or rejecting voter registration applications based on a failure to match the applicant's DLN or SSN4 as provided on the application with corresponding records on file;

(b)    permit all applicants whose registration applications have not been accepted due to an "unverified" DLN or SSN4 to vote and have their ballots counted unless election officials have or obtain other evidence, aside from the failure to verify through Florida's automated matching process, indicating that the voter's identity is in question or that the voter is otherwise not eligible to vote;

(c)    place otherwise eligible applicants on the voter rolls in active status if their voter registration application was denied solely due to a failure to satisfy the "exact match" requirement; and

(d)    maintain, preserve, and not destroy until after December 31, 2026, any and all records relating to Florida's voter registration verification program;

110.   Retain jurisdiction over Defendants for such period of time as may be appropriate to ensure Defendants' compliance with relief ordered by this Court;

111.   Award Plaintiff its reasonable attorneys' fees and costs pursuant to statute; and

112.   Grant Plaintiff such other and further relief as may be just and equitable.

Respectfully submitted this 17th day of September, 2024,

/s/ Miriam Fahsi Haskell

Miriam Fahsi Haskell
FL Bar No. 69033
**Community Justice Project, Inc.**
3000 Biscayne Blvd #106
Miami, FL 33137
(305) 907-7697
miriam@communityjusticeproject.com

John Powers*
Matthew A. Fogelson*
**Advancement Project**
1220 L Street NW, Suite 850
Washington, DC 20005
(202) 728-9557
JPowers@advancementproject.org
MFogelson@advancementproject.org

Neil A. Steiner*
Angela M. Liu*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3500
Neil.Steiner@dechert.com
Angela.Liu@dechert.com

Mark Dorosin**
FL Bar No. 1041169
201 FAMU Law Lane
Orlando, FL 32801
(407) 254-4043
markdorosin@gmail.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2380
Christopher.Merken@dechert.com

Zane Martin*
**Dechert LLP**
45 Fremont Street
26th Floor
San Francisco, CA 94105
(415) 262-4563
Zane.Martin@dechert.com

\* *Pro Hac Vice* applications forthcoming
\*\* Application for admission submitted September 13, 2024 and pending