## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

FLORIDA RISING TOGETHER, INC.
and FLORIDA RISING, INC.

*Plaintiffs*,

    v.

No: 6:24-cv-1682

CORD BYRD, in his official capacity as
Florida Secretary of State, et. al.,

*Defendants*,

REPUBLICAN NATIONAL
COMMITTEE and REPUBLICAN PARTY
OF FLORIDA,

*Intervenor-Defendants.*

## REPUBLICAN INTERVENOR-DEFENDANTS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Florida makes it easy to register to vote. Floridians can register online, through the mail, or in person at various government offices. The application is short and simple. And election officials are quick and efficient. They respond quickly, inform applicants of any errors, and even work to correct errors themselves. Even if an applicant is unable to register by election day, Florida allows her to cast a provisional ballot and correct the registration on the back end.

The Amended Complaint supports those facts. And it shows a registration system that is accessible, open, equal, and accommodating. Plaintiffs Florida Rising Together and Florida Rising draw a different conclusion: they claim that Florida makes it too hard to register to vote, largely due to "data entry errors, typos, misreading of

imperfect handwriting by elections officials and computer glitches within the State's registration system." Am. Compl. ¶78. So Plaintiffs demand a court order compelling election officials to tolerate errors in the registration process. *Cf. id.* ¶153.

No law requires Florida to register applicants whose information it can't verify. Identity verification is vital to any election system. It ensures that the person registering is who she says she is and prevents the creation of duplicate registrations. And it ensures that she's qualified to vote. Like any State running a functional voter registration system, Florida matches application information against various sources to confirm an applicant's identity. Of course, every system will generate errors. But those run-of-the-mill errors are not problems of a constitutional dimension.

Federal law doesn't prohibit Florida's ID and matching procedures. It requires them. In the Help America Vote Act, Congress set uniform rules for voter registration in federal elections. HAVA requires States to obtain "the applicant's driver's license number" or "the last 4 digits of the applicant's social security number." 52 U.S.C. §21083(a)(5). They must "match" that information in their databases. *Id.* However loose Plaintiffs would prefer the matching process to be, States retain authority to determine the "validity of numbers provided." *Id.* In any event, these are only "minimum requirements." *Id.* §21084. Nothing "prevent[s] a State from establishing election technology and administration requirements that are more strict." *Id.*

The Court dismissed Florida Rising's initial complaint in September as a shotgun pleading, and because it failed to join necessary defendants. Doc. 102. Plaintiffs filed an Amended Complaint, but it fails to state a claim. While the other Defendants'

motions to dismiss focus on jurisdictional issues, Intervenor-Defendants the Republican National Committee and Republican Party of Florida explain in this motion why the Amended Complaint should be dismissed on the merits.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must "'state a claim to relief that is plausible on its face'" and contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "assume the veracity of well-pleaded factual allegations," but they can't credit mere "labels and conclusions." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022). Although claims that a state law unduly burdens the right to vote can be "fact-intensive," courts "have not shied away from disposing of [such] claims at the motion-to-dismiss stage where a plaintiff's allegations 'failed as a matter of law.'" *Daunt v. Benson*, 999 F.3d 299, 313 (6th Cir. 2021).

## ARGUMENT

Each of Plaintiffs' three claims flunks Rule 8. Count I, alleging an unconstitutional burden on the right to vote, runs straight into Supreme Court precedent holding that voter-identification requirements don't violate the Constitution. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008) (plurality op.). Count II, the National Voter Registration Act claim, fails because the provision Plaintiffs invoke governs list-maintenance programs, not registration programs. And Count III, the Voting Rights Act claim, fails because the allegations don't support a plausible inference that

Florida's voting system is not equal and open to all voters. The Court should dismiss all three claims under Rule 12(b)(6).

## I. The *Anderson-Burdick* claim fails because verifying voter identity furthers compelling state interests and doesn't burden the right to vote.

Voter-identification requirements don't violate the Constitution. *Crawford*, 553 U.S. at 185, 189. Much less does requiring applicants to write down an ID number violate the Constitution. And in light of Florida's many accommodations, any perceived burdens vanish entirely. *Crawford* alone warrants dismissing the *Anderson-Burdick* claim. Even if it didn't, the *Anderson-Burdick* claim fails because Plaintiffs allege only *de minimis* burdens on a handful of voters facing unique circumstances.

### A. Binding precedent forecloses the *Anderson-Burdick* claim.

In *Crawford*, the Supreme Court upheld Indiana's law requiring in-person voters "to present photo identification issued by the government" before they could vote. 553 U.S. at 185. There, the plaintiffs alleged that requiring voters to identify themselves "substantially burdens the right to vote in violation of the Fourteenth Amendment" and "arbitrarily disfranchise[s] qualified voters who do not possess the required identification." *Id.* at 187. The Court dismissed those claims.

This case is no different. In fact, Florida's limited identification procedures are more accommodating and less burdensome than Indiana's blanket photo ID law. For at least six reasons, *Crawford* requires dismissing the complaint.

**First**, *Crawford* holds that States can require government-issued photo IDs from voters as a prerequisite to voting. With a few limited exceptions, Indiana required

every in-person voter to present a photo ID before they could vote. *Id.* at 185-86. Under *Crawford*, Florida could demand a photo ID from all applicants, not just those whose ID number can't be verified. Florida's identification requirement is more limited. It applies only to applicants who election officials can't confirm have a valid ID number. *See* Fla. Stat. §97.053(6). That is, Florida requires ID at the registration stage only when election officials have some evidence that the person is either not a qualified voter or that the person applying is not who she says she is. That Florida has more narrowly tailored its ID requirement makes it more obviously constitutional, not less.

**Second**, just like Indiana's law, Florida's law is facially neutral. Plaintiffs don't allege that Florida's matching procedures are "invidious" or "irrelevant to the voter's qualifications." *Crawford*, 553 U.S. at 189. Nor could they. "States employ different methods of identifying eligible voters," from checking names, signatures, addresses, and ID numbers, to requiring some form of physical ID. *Id.* at 197. Basic identification procedures are "unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral process." *Id.* at 191.

**Third**, both state laws impose at most a minimal, incidental burden on voters. The Supreme Court upheld Indiana's blanket photo-ID requirement even while acknowledging that it placed a "heavier burden … on a limited number of persons." *Id.* at 199. Those groups included "homeless persons," religious objectors, and "persons who because of economic or other personal limitations may find it difficult … to obtain a state-issued identification." *Id.* But "[f]or most voters who need them, the

5

inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Id.* at 198. Plaintiffs admit that "individuals who register online or at a motor vehicle office are almost entirely immune from being flagged as 'unverified.'" Am. Compl. ¶8. Even "possibly matched" and "unmatched" applications aren't rejected outright. They receive further review. Am. Compl. ¶¶72-73. Florida's multi-layered accommodations make its law even less burdensome than Indiana's already minimally burdensome law. And compared to Indiana voters who must provide ID on election day, Floridians such as Ms. Bach are notified months in advance of the election if their identity cannot be verified. Am. Compl. ¶¶105-112. So "even assuming that the burden may not be justified as to a few voters" who don't make it past those accommodations, "that conclusion is by no means sufficient to establish [plaintiffs'] right to the relief they seek in this litigation." *Crawford*, 553 U.S. at 199-200.

**Fourth**, both Florida and Indiana allow voters to cast provisional ballots if they can't meet the requirement. Whatever the "severity of [the] burden" imposed by ID requirements, it "is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted." *Id.* at 199. Floridians who verify their identity by election day are registered and can cast a regular ballot. Fla. Stat. §97.053(6). Anyone who can't meet that requirement can still cast a provisional ballot that will be counted if they present "evidence to the supervisor of elections sufficient to verify the authenticity" of their information "no later

than 5 p.m. of the second day following the election." *Id.* The provisional-ballot accommodation makes it "unlikely that such a requirement would pose a constitutional problem unless it is wholly unjustified." *Crawford*, 553 U.S. at 199.

**Fifth**, the same state interests present in *Crawford* justify Florida's law. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* at 196. Voter ID furthers the State's "interest in deterring and detecting voter fraud." *Id.* at 191. Florida's ID law especially furthers the State's "interest in orderly administration and accurate recordkeeping," *id.* at 196, since it kicks in only to *correct false information*. These safeguards further the State's "interest in protecting public confidence," which "has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197. As a matter of law, these interests are "unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral process." *Id.* at 191.

**Sixth**, Plaintiffs here, just like the *Crawford* plaintiffs, "advance[] a broad attack on the constitutionality of [state law], seeking relief that would invalidate the statute in all its applications." *Id.* at 200. That facial attack gives Plaintiffs "a heavy burden of persuasion." *Id.* The claim demands "a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity." *Id.* At most, those allegations could support relief as applied to those special

voters. They don't support "that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute." *Id.* at 203.

Each of these deficiencies is present on the face of the complaint—no amount of factual development could cure them. So the only arguably relevant difference between this case and *Crawford*—the procedural posture—is no difference at all. Discovery can't change the fact that Florida's ID law is narrowly tailored, is facially neutral, imposes *de minimis* burdens on only a subset of voters, provides numerous accommodations, allows for provisional voting, and is supported by compelling state interests. And Plaintiffs' broad facial challenge means "they bear a heavy burden of persuasion," not just production. *Id.* at 200. The Supreme Court was thus not shy about dismissing the *Anderson-Burdick* claims in *Crawford* even though, for example, "[t]he record contain[ed] no evidence of any [election] fraud actually occurring in Indiana at any time in its history." *Id.* at 194.

Plaintiffs can't paper over their deficient pleading with conclusory allegations that Florida's law "impose[s] severe burdens on Floridians' fundamental right to vote." *E.g.*, Am. Compl. ¶13. That's because the "characterization of the resultant burden … is not a factual finding, but a legal determination subject to de novo review." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 628 (6th Cir. 2016). Courts have thus "not shied away from disposing of *Anderson-Burdick* claims at the motion-to-dismiss stage where a plaintiff's allegations 'failed as a matter of law.'" *Daunt*, 999 F.3d at 313 (collecting cases). The Court should apply that straightforward precedent and trim the constitutional claims from this case.

8

**B.    The *Anderson-Burdick* claim fails because Plaintiffs complain only of *de minimis* burdens on idiosyncratic voters.**

The Court need not look beyond *Crawford* for reasons to dismiss the *Anderson-Burdick* claim. But if it did, Plaintiffs fail to state a claim for at least three other reasons: they complain only of *de minimis* burdens; they attempt to transform a voter-burden test into an error-rate test; and they rely on burdens that fall on idiosyncratic voters rather than "the right to vote" generally.

**First**, the burden of correctly writing one's ID number on an application is so minor it's hardly a burden at all. The *Anderson-Burdick* test "does not apply … where the burden on a constitutional right is no more than *de minimis*." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 139 (3d Cir. 2022). Since 2002, federal law has mandated that every "application for voter registration for an election for Federal office" contain either "the applicant's driver's license number" or "the last 4 digits of the applicant's social security number." 52 U.S.C. §21083(a)(5)(A)(i). "For a voter with a functioning pen, sufficient ink, and average hand dexterity," providing those numbers "should take less than five seconds." *Cf. Eakin v. Adams Cnty. Bd. of Elections*, 158 F.4th 185, 190 (3d Cir. 2025) (Bove, J., dissenting sur denial of rehearing en banc) (discussing Pennsylvania's date requirement for absentee ballots). For decades, Floridians have had no trouble taking that simple step. Fla. Stat. §97.053(5)(a).

*Anderson-Burdick* challenges to similar laws have failed for the same reason. A state law that "requires a single designated drop-off location per county" for early ballots, for example, is "no more than a *de minimis* burden on the right to vote." *Tex.*

*LULAC v. Hughs*, 978 F.3d 136, 145 (5th Cir. 2020). When States require physical signatures on applications, "'one strains to see how it burdens voting at all.'" *Vote.Org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022) (quoting *LULAC*, 978 F.3d at 144); *cf. Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020) (staying district court injunction of witness signature requirement for absentee ballot).

For the few voters whose written information doesn't match, providing ID is hardly more burdensome. "For most voters who need [an ID], the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198. The Eleventh Circuit thus upheld Georgia's photo-ID law in part because "the burden imposed on Georgia voters who lack photo identification was not undue or significant." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009).

Moreover, Florida "has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots." *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020). Floridians receive notice and an opportunity to cure any deficiencies. Those who verify their identity by election day are registered and can vote. Fla. Stat. §97.053(6). Those who can't verify their identity by election day can still cast a provisional ballot. *Id.* These accommodations alleviate any supposed burdens, indicating that the challenged law "does not implicate the right to vote at all." *New Ga. Project*, 976 F.3d at 1281.

**Second**, the Constitution doesn't demand perfection from election officials. Because Plaintiffs can't credibly claim that writing a number or presenting identification is an unconstitutional burden, they reframe the case as a challenge to Florida's allegedly error-prone procedure in matching those numbers. Plaintiffs claim that rejecting an application for "common errors" unrelated "to a voter's eligibility" burdens the right to vote. Am. Compl. ¶5. But the *Anderson-Burdick* test governs burdensome requirements on voters, not potential mistakes by election officials. "[I]t is just not enough to conclude that if some ballots are likely to be rejected because of a rule, 'the burden on many voters will be severe.'" *New Ga. Project*, 976 F.3d at 1281.

Plaintiffs would transform the *Anderson-Burdick* test into an error-rate test. Instead of looking at voters' burdens, they focus on election officials' mistakes. The test would force courts to weigh what level of competence, efficiency, and care the Constitution requires of election officials who process voter applications. That test would "allow[] a political question—whether a rule is beneficial, on balance—to be treated as a constitutional question and resolved by the courts rather than by legislators." *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020). "*Burdick* forecloses that sort of substitution of judicial judgment for legislative judgment." *Id.* For that reason, courts "wisely have resisted deploying *Anderson-Burdick* in new frontiers" of this sort. *Daunt*, 999 F.3d at 329 (Readler, J., concurring in the judgment).

In any event, Plaintiffs acknowledge numerous ways the State minimizes even these "benign" errors. To state the obvious, the State is not responsible for voter-

created errors such as "unwittingly revers[ing] two digits in their driver's license number or omit[ting] a hyphen when filling out their name." Am. Compl. ¶80. And errors by election officials are subject to various checks designed to minimize their occurrence. Plaintiffs acknowledge, for example, that the State distinguishes between "'Possibly Matched' and 'Unmatched'" records. Am. Compl. ¶72 (citing Fla. Admin. Code §1S-2.039(5)(a)(2)). Neither are immediately rejected—both receive "further review." *Id.* Officials first check for "data entry error[s]" that might have caused the mismatch. *Id.* ¶73. If they find one, an official "corrects the … record and re-submits" it for matching. *Id.* If officials can otherwise "confirm that the PIN belongs to the applicant," they simply "complete[] the registration process for that applicant." *Id.* ¶74. And if they are "unable to resolve the failure to match," they "flag[] the applicant's … record as 'unverified' and send[] it to the Supervisor of the applicant's home county for further action." *Id.* ¶75 (citing Fla. Admin. Code §1S-2.039(5)(a)(3)). At least some counties instruct officials to "[a]lways double-check your work." *Id.* ¶98. And at the end of that process, mismatched applicants still have the opportunity to present identification to remedy whatever record-keeping errors might have occurred. *See* Fla. Stat. §97.053(6).

The Constitution does not require an error-free registration process. And no case supports extending *Anderson-Burdick* from burdens on voters to mistakes by election officials. That's because a system's error rate—no matter how high—doesn't change what the voter must do to register: fill out the application correctly and legibly. *Cf.* Am. Compl. ¶76. "Doggedly employing *Anderson-Burdick* where it has no

application would be nothing but a camouflaged interest in asserting 'will' rather than 'judgment.'" *Jackson v. Tarrant Cnty.*, 158 F.4th 571, 593 (5th Cir. 2025) (cleaned up).

**Third**, the minimal burdens that Plaintiffs identify are idiosyncratic, not widespread. The *Anderson-Burdick* test "appl[ies] to laws that burden the right to vote." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir. 2020). The Court must "'identify a burden before [the Court] can weigh it.'" *Id.* (quoting *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment)). But the burdens that Plaintiffs complain of are "irrelevant" because they are "'special burden[s] on' some voters," not categorical burdens on all voters. *Crawford*, 553 U.S. at 204 (Scalia, J., concurring in the judgment) (citation omitted). To state a claim, Plaintiffs must allege a "significant increase over the usual burdens of voting" for "most voters." *Id.* at 198 (plurality op.).

Take, for example, the single voter identified in the complaint. Ms. Bach doesn't allege that she filled out her registration application correctly or legibly. The complaint contains no allegation tying her "unverified" status to the alleged problems with the matching process. Am. Compl. ¶¶105-106. To the contrary, the allegations show that Duval County consistently processed her applications and notified her within a day or two of receiving the application. Ms. Bach, however, waited weeks in between submitting those corrected applications—and nowhere does she allege that they were correct or legible. *Id.* ¶¶105-108. After providing Ms. Bach several chances to fix the application, the official invited her to provide "evidence … sufficient to verify the authenticity of [her] driver's license number, Florida identification card number, or last

four digits of the social security number." Fla. Stat. §97.053(6). Ms. Bach provided none of those things. Instead, she offered "her passport, a letter from SSA, and a bank account letter," Am. Compl. ¶107, none of which contain the appropriate information. When told she needed to provide the correct information, Ms. Bach refused, claiming that she "is exempt from documentation requirements due to her age and overseas voter status and that Florida law does not require her to provide a social security card." *Id.* ¶109. Days before the election, Ms. Bach provided evidence of her "social security number." *Id.* ¶111. She was registered and provided a ballot via email, which she was unable to open. *Id.* ¶112. She ultimately voted by federal write-in ballot, which didn't contain "all of the elections for which she was eligible." *Id.* ¶113.

Cases like this one often fail because plaintiffs can't "locate a single voter who would bear a significant burden," which indicates "that the [state law] does not unduly burden the right to vote." *Common Cause/Ga.*, 554 F.3d at 1354. Even the lone voter here complains of "ordinary burdens" that "'aris[e] from life's vagaries,'" *id.*, such as waiting weeks between submitting applications, or not being able to open an email ballot, Am. Compl. ¶¶105-107, 112. The other alleged burdens are idiosyncratic and not experienced by "most voters." *Crawford*, 553 U.S. at 198. Those include name changes, "compound last names," and voters "with symbols in their name," Am. Compl. ¶79, as well as "age and overseas voter status," ¶109.

In sum, Plaintiffs allege burdens caused by a voter's unique circumstances, not by the law they challenge. Burdens of that sort "do not 'raise any question about the

constitutionality of the [state] statute." *Common Cause/Ga.*, 554 F.3d at 1354 (quoting *Crawford*, 553 U.S. at 197). The Court should dismiss Plaintiffs' *Anderson-Burdick* claim.

## II. The NVRA claim fails because verifying voter identity isn't a voter-roll "maintenance" task, and it's nondiscriminatory.

Plaintiffs demand a novel extension of the NVRA. They would have the Court misconstrue 52 U.S.C. §20507(b)'s *list-maintenance* provisions to apply at the registration stage. And they would have the Court apply a radical disparate-effects test to the uniformity requirement. No authority supports either extension.

### A. Section 20507(b) governs list maintenance, not voter registration.

The NVRA sets procedures for voter registration and voter-roll maintenance. Section 20503 sets "[n]ational procedures for voter registration for elections for Federal office." By contrast, §20507(b)—the provision Plaintiffs invoke—establishes standards for "[a]ny State program or activity" that "ensur[es] the maintenance of an accurate and current voter registration roll." HAVA—not the NVRA—requires that States implement those procedures "in a uniform and nondiscriminatory manner." 52 U.S.C. §21083(a)(1)(A). Plaintiffs don't have a private right of action to enforce HAVA. So they try to twist the NVRA's "uniform [and] nondiscriminatory" requirement in §20507 to apply beyond the registration stage. But §20507 imposes "limitations" that apply "to state removal programs." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 764 (2018). Those limitations don't apply to the registration stage.

The NVRA claim fails at the outset because Plaintiffs don't challenge a "state removal program[]." *Id.* Plaintiffs admit that applicants whose information does not

match state records "will not be registered to vote." Am. Compl. ¶27. The procedures they challenge govern *applicants*, not registered voters facing removal through a list "maintenance" program. 52 U.S.C. §20507(b). Courts agree: "Section 8(b), which expressly addresses confirming rather than soliciting voter registration, speaks to ensuring the *maintenance*, not the enlargement, of current voter registration rolls." *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1095 (D. Ariz. 2023), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025). In reviewing that decision, the Ninth Circuit did not upset the district court's ruling that "the State is entitled to judgment as a matter of law on any claim that the State treats *applicants* to vote in a nonuniform or discriminatory way." *Id.* at 1095; *see Mi Familia Vota*, 129 F.4th at 714-17. That conclusion follows from "the plain language of the NVRA" and is supported by "[b]inding authority." *Mi Familia Vota*, 691 F. Supp. 3d at 1095 (citing *Husted*, 584 U.S. at 764).

The Help America Vote Act reinforces that text and precedent. HAVA requires applicants to provide a valid ID number on their application: "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes … a current and valid driver's license, the applicant's driver's license number," or for certain applicants "the last 4 digits of the applicant's social security number." 52 U.S.C. §21083(a)(5)(A). HAVA requires officials "to match information" in their respective databases "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." *Id.* §21083(a)(5)(B).

16

According to Plaintiffs, the NVRA prohibits the very matching that HAVA requires. Plaintiffs try to square that circle by arguing that "HAVA does not mandate that voter registration applications be declined if the applicant's voter registration record fails to match records in the DHSMV or SSA databases." Am. Compl. ¶50. According to Plaintiffs, States must *gather and match* information about voters; they just can't do anything with those results, even if they show the voter is not qualified. But when Congress required States to gather and match information, it did so "in the context of an official mandate to accept and use something for a given purpose." *Cf. Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 10 (2013). Plaintiffs' interpretation of the NVRA would render HAVA's matching process meaningless.

Plaintiffs next attempt to avoid HAVA's matching requirement by arguing that HAVA doesn't require an "exact match." *See* Am. Compl. ¶¶52-55, 70. But the distinction between a "match" and an "exact match" is sophistry. Either two sets of names and numbers match, or they don't. Congress didn't need to modify "match" with redundant words to make its meaning clear. *Cf.* 52 U.S.C. §21083(a)(5)(B). Regardless, any ambiguity is left to the States to determine the "validity of numbers provided." *Id.* §21083(a)(5)(A)(iii). Even when the information doesn't match, Florida provides an extra layer of review to check for "data entry errors" and other innocent mistakes that might have generated the mismatch. Fla. Admin. Code R. 1S-2.039(5)(a)(2). As Plaintiffs acknowledge, if election officials "determine[] that a data entry error occurred," they correct and resubmit the record for another round of matching. Am. Compl. ¶73. Those procedures help distinguish innocent errors from other

17

kinds of errors. But they don't change what it means "to match information." 52 U.S.C. §21083(a)(5)(B). In any event, HAVA establishes only "minimum require-ments." *Id.* §21084. Courts cannot "construe[]" the statute "to prevent a State from establishing election technology and administration requirements that are more strict." *Id.* And Plaintiffs don't claim that Defendants are *violating* any of these HAVA provi-sions, or else they would have included a HAVA claim in the Amended Complaint.

### B. Florida's identification process is uniform and nondiscriminatory.

Even if §20507(b) applied to the registration stage, Plaintiffs don't allege facts supporting an inference that Florida's identification procedures are non-uniform or discriminatory. Every Floridian registering to vote must provide a driver's license number, identification card number, or Social Security number on their voter-registra-tion application. Fla. Stat. §97.053(5)(a). Applicants lacking those numbers can still register by affirming their qualifications "in the manner prescribed in the uniform statewide voter registration application." *Id.* Regardless which method the applicant uses, election officials verify the information. *See id.* Florida's identification procedures thus "apply to everyone involved in the process" of voter registration, not merely a "selected class." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703, 707 (N.D. Ohio 2006). Any doubt that these procedures are "uniform" is put to rest by the HAVA, which draws the same distinction between driver's licenses, identification card, and Social Security numbers. 52 U.S.C. §21083(a)(5)(A)(i). When a State "simply follows federal law," it doesn't violate the NVRA. *Husted*, 584 U.S. at 775.

Florida's identification procedures are also non-discriminatory. Plaintiffs allege that various groups experience disparate *effects*, *see* Am. Compl. ¶¶172-173, but they have not alleged that Florida "carried out its program with discriminatory intent," *Husted*, 584 U.S. at 779. "The term 'nondiscriminatory'" in the NVRA "is intended to mean that the procedure complies with the requirements of the Voting Rights Act of 1965." S. Rep. No. 103-6, at 31; H.R. Rep. No. 103-9, at 14-15. At a minimum, that reading means Plaintiffs' allegations of *geographical* discrimination fail as a matter of law. *See* Am. Compl. ¶173. And it means their allegations of racial discrimination are at best derivative of their Voting Rights Act claim, which also fails as a matter of law. *See infra* Section III. Florida's neutral, generally applicable identification procedures don't violate the NVRA.

**III.  The Voting Rights Act claim fails because the complaint doesn't support a plausible inference that Florida's system is not "equally open" to all races.**

Section 2(a) of the Voting Rights Act prohibits States from employing a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. 10301(a). The "results" test is clarified by §2(b), which states that §2 is violated only if the election "processes" are not "equally open to participation" by members of the protected group, "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." "A finding of discriminatory impact is [thus] necessary and sufficient to establish a section 2 violation." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 942 (11th

19

Cir. 2023). "But equal openness remains the touchstone." *Brnovich v. DNC*, 594 U.S.

647, 668 (2021). For at least six reasons, the Amended Complaint fails to allege that

Florida elections are not "equally open" to a protected class.

**First**, basic ID requirements impose at most a *de minimis* burden on voting,

which is "highly relevant" to whether Floridians have sufficient "'opportunity'" to

vote. *Id.* at 669. Obtaining a state ID "does not qualify as a substantial burden on the

right to vote, or even represent a significant increase over the usual burdens of voting."

*Crawford*, 553 U.S. at 198 (plurality op.). Much less is it a "substantial burden" to fill

out the application correctly, which avoids the ID requirement entirely. Plaintiffs' §2

claim fails for the same reason their *Anderson-Burdick* claim fails: "[m]ere inconven-

ience cannot be enough to demonstrate a violation of §2." *Brnovich*, 594 U.S. at 669.

**Second**, Florida's ID requirements were "standard practice when §2 was

amended in 1982." *Brnovich*, 594 U.S. at 669-70. Florida has required voters to present

ID since at least 1977. *See Florida History: Voter ID at the Polls*, Fla. Div. of Elections

(July 2016), perma.cc/X2PV-BZFM. That voter ID "was standard practice when §2

was amended in 1982" means it's unlikely that it imposed a burden "sufficient to pre-

vent voting from being equally 'open' or furnishing an equal 'opportunity' to vote in

the sense meant by §2." *Brnovich*, 594 U.S. at 669-70. HAVA reinforces that conclu-

sion, since Congress not just approved of the practice but *required* States to obtain from

applicants either a "valid driver's license," a "driver's license number," or for certain

applicants "the last 4 digits of the applicant's social security number." 52 U.S.C.

§21083(a)(5)(A). And it further required States "to match information" in their respective databases "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." *Id.* §21083(a)(5)(B). Complying with HAVA doesn't violate the VRA.

**Third**, the alleged racial disparities—even taken as true—are not so significant "to indicate that [the] system is not equally open." *Brnovich*, 594 U.S. at 671. The Amended Complaint largely relies on disparities between "unverified" black and white applicants, using the percentage of "registered" voters as the point of comparison. *See* Am. Compl. ¶¶123-140. The methodology suffers from numerous flaws. To start, the number of "unverified" applicants affects the number of "registered" voters, so comparing the two numbers is meaningless; as the number of "unverified" applicants decreases, the number of "registered" voters increases. Plaintiffs ignore other racial groups, and they don't explain why "white applicants" are the relevant comparator. The allegations are thus "not enough to meet section 2's high standard" to show that the "political processes leading to election in Florida are not equally open to black voters." *League of Women Voters*, 66 F.4th at 943 (cleaned up).

But the Court needn't wade into these statistical issues—Plaintiffs' own allegations defeat their disparate-impact claims. Plaintiffs admit that each applicant's chosen "method of registration" determines whether the matching procedure "impacts applicants attempting to register to vote." Am. Compl. ¶141. Because the matching procedures apply only to applicants filing "a paper voter registration application," applicants can avoid the manual matching process by registering online or at "a motor vehicle

office." Am. Compl. ¶141-143. Any disparities between racial groups are thus the result of voluntary choices to register via paper applications, not the result of a discriminatory law. Plaintiffs even admit that they—not state law—are driving the racial disparity: "A major driver of the large racial disparities is the fact that [voter-registration organizations] like Florida Rising Together are registering large numbers of Black and other non-white applicants." Am. Compl. ¶147. The reason black applicants show more rejected paper applications is because groups like Florida Rising *are targeting those groups with paper applications*. Table 3 in the Amended Complaint leaves no doubt that third-party organizations like Plaintiffs' are responsible: they account for more than 75% of unverified applications. Am. Compl. ¶145. Plaintiffs' allegations defeat themselves.

**Fourth**, Florida generously accommodates residents who are registering to vote. As in the *Anderson-Burdick* analysis, "courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision." *Brnovich*, 594 U.S. at 671. Applicants can register to vote online, at the DMV, through mail, or through a variety of other avenues. Am. Compl. ¶¶142-145. Florida provides numerous checks, accommodations, and provisional contingencies throughout that process. *See supra* Section I.B. And Ms. Bach's experience shows that Florida's election officials are quick, responsive, and accommodating. *See* Am. Compl. ¶¶104-112. The burden is minimal. *Brnovich*, 594 U.S. at 671.

22

**Fifth**, Florida's identification procedures further many legitimate state interests.

*Crawford* outlines the state interests furthered by identification laws. *See supra* Section

I.A. Those interests include "orderly administration and accurate recordkeeping,"

"preventing voter fraud," and safeguarding "public confidence in the integrity of the

electoral process." *Crawford*, 553 U.S. at 196 (plurality op.). "[T]he strength of the state

interests" that Florida's registration rules promote is "an important factor" in whether

it complies with §2. *Brnovich*, 594 U.S. at 671. And "[t]here is no question about the

legitimacy or importance" of those interests. *Crawford*, 553 U.S. at 196.

**Sixth**, the Amended Complaint relies on discredited historical allegations that

can't support a plausible inference of discrimination. Plaintiffs allege that "Florida's

history of racial discrimination" continues to affect black voters' opportunity "to par-

ticipate in the political process." Am. Compl. ¶148. They point to "[h]istorical condi-

tions," "disproportionat[e]" ballot-rejection rates after the 2000 election, and income

disparities. *Id.* ¶¶149-151. None of those disparities have anything to do with Florida's

registration process. Even if they did, courts must be "mindful of the danger of allow-

ing the old, outdated intentions of previous generations to taint [state] legislative action

forevermore on certain topics." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992

F.3d 1299, 1325 (11th Cir. 2021). Just two years ago, the Eleventh Circuit reversed a

district court's finding that Florida's history supported a finding of discriminatory in-

tent under §2. *League of Women Voters*, 66 F.4th at 923. The court rejected each piece

of evidence that Plaintiffs invoke here: neither "old, outdated intentions of previous

23

generations," nor Florida's "recent history … since the year 2000," nor "socioeconomic disparities" can "support a finding of discriminatory intent." *Id.*

*    *    *

This case shouldn't make it past the pleading stage. Taking the Amended Complaints' numbers, stories, and allegations as true, nothing in it points to a legal violation. *Crawford* forecloses Plaintiffs' constitutional claim. Plaintiffs' NVRA theory is found nowhere in the statute. And its VRA claim falls far short of alleging a closed, unequal voting system.

**CONCLUSION**

The Court should grant the motion to dismiss the Amended Complaint.

Dated: December 31, 2025                    Respectfully submitted,

 */s/ Daniel E. Nordby*

Gilbert C. Dickey* (Lead Counsel)        Daniel E. Nordby
Thomas R. McCarthy*                       Fla. Bar No. 14588
Conor D. Woodfin*                        Benjamin J. Gibson
CONSOVOY MCCARTHY PLLC                     Fla. Bar No. 058661
1600 Wilson Blvd., Ste. 700              Tara R. Price
Arlington, VA 22209                        Fla. Bar No. 98073
(703) 243-9423                           SHUTTS & BOWEN LLP
tom@consovoymccarthy.com                 215 South Monroe St., Ste. 804
gilbert@consovoymccarthy.com             Tallahassee, Florida 32301
conor@consovoymccarthy.com               (850) 241-1717
                                         dnordby@shutts.com
                                         bgibson@shutts.com
*admitted *pro hac vice*                 tprice@shutts.com

*Counsel for Intervenor-Defendants
the Republican National Committee and
Republican Party of Florida*

24

## LOCAL RULE 3.01(g) CERTIFICATION

In accordance with Local Rule 3.01(g), Counsel for Intervenor-Defendants certifies that on December 29, 2025, counsel for Intervenor-Defendants conferred with Counsel for Plaintiffs concerning this Motion to Dismiss. Plaintiffs oppose the motion.

*/s/ Daniel E. Nordby*

## CERTIFICATE OF SERVICE

**I CERTIFY** that on December 31, 2025, I electronically filed this document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Daniel E. Nordby*