**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**FLORIDA RISING TOGETHER, INC. and FLORIDA RISING, INC.,**

**Plaintiffs,**

**v.** **Case No.: 6:24-cv-01682-AGM-NWH**

**CORD BYRD, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE FOR THE STATE OF FLORIDA, et al.,**

**Defendants.**

---

**ORDER**

Article III of the United States Constitution does not empower federal judges to usurp the power of the political branches or adjudicate constitutional questions manufactured by meddlers. Because the allegations of the First Amended Complaint compel the conclusion that Florida Rising Together, Inc. and Florida Rising, Inc. demand that this Court do both things, the First Amended Complaint must be dismissed with leave to amend.

In short, Florida Rising Together, Inc. and Florida Rising, Inc. complain that the Florida Election Code requires evidence that voter registration applicants are who they say they are, if federally-required information on their voter registration application does not match information in a database that federal law requires Florida to maintain. It is true that Florida law requires this. Democratically-elected representatives of the people of Florida enacted this part of the Election Code in compliance with federal election law and as an expression of the will of the people of Florida.

Florida Rising Together, Inc. and Florida Rising, Inc. believe the United States Constitution does not permit Floridians to have their way on this issue. They seek an injunction that would prevent Florida from enforcing this aspect of its Election Code.

But in their 55-page First Amended Complaint, Florida Rising Together, Inc. and Florida Rising, Inc. do not identify a single person who could not get registered to vote because Florida required evidence of their identity. Corporations cannot vote in Florida's elections, so of course Florida Rising Together, Inc. and Florida Rising, Inc. do not claim that Florida's voter identification laws prevented them from voting.

Although nobody but Florida Rising Together, Inc. and Florida Rising, Inc. comes to this Court complaining about Florida's Election Code, these two corporations demand that Florida's Election Code be enjoined, at least to the extent that it requires evidence of identity when federally-required information does not match the federally-required database.

At this stage of the case, the focus is not on the merits. Instead, the question is a threshold one: Does this case present the type of case or controversy that the Constitution gives this Court the power to adjudicate? For reasons detailed below, the answer is no.

## I. The Motions to Dismiss

In the First Amended Complaint, Florida Rising Together, Inc. and Florida Rising, Inc. sue Florida's Secretary of State and thirteen county supervisors of elections. The Secretary moved to dismiss (Doc. # 148), arguing that the First Amended Complaint fails to establish standing. Florida Rising filed a Memorandum of Law in Opposition (Doc. # 170) and the Secretary filed a reply (Doc. # 191). The Republican National Committee and the Republican Party of Florida have intervened in this case. They also moved to dismiss (Doc. # 145; the

"**Intervenors' Motion**"), but the Intervenors' Motion raises issues that cannot be reached until Florida Rising satisfies this Court that it has jurisdiction. For that reason, the Intervenors' Motion is due to be denied without prejudice.

## II. Background

### A. HAVA

The Help America Vote Act ("**HAVA**") requires that "each State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). According to HAVA, "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" either "the applicant's driver's license number," if the applicant has been issued a current and valid driver's license, or "the last 4 digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A)(i). Under HAVA, if a voter cannot provide a driver's license number or the last four digits of their Social Security number, then the State is required to assign to that voter a unique identification number for entry into the database. 52 U.S.C. § 21083(a)(5)(A)(ii). HAVA also requires that a State "shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law." 52 U.S.C. § 21083(a)(5)(A)(iii).

### B. The Florida Election Code

The Florida Election Code provides that "[a] voter registration application is complete and becomes the official voter registration record of that applicant when all information necessary to establish the applicant's eligibility pursuant to § 97.041 is received by a voter

registration official and verified."[1] Fla. Stat. § 97.053(2). "[I]f the applicant fails to complete his or her voter registration application on or before the date of book closing for an election, such applicant is not eligible to vote in that election." *Id.*

Under the Florida Election Code, a voter registration application must contain the following information: (1) the applicant's name; (2) the applicant's address of legal residence; (3) the applicant's date of birth; (4) a mark in a checkbox affirming that the applicant is a United States citizen; (5) a mark in a checkbox affirming that the applicant has not been convicted of a felony or, if convicted, has had his or her voting rights restored; (6) a mark in the checkbox affirming that the applicant has not been adjudicated mentally incapacitated with respect to voting or, if so adjudicated, has had the right to vote restored; (7) an original or digital signature under penalty of perjury; and (8) the applicant's current and valid Florida driver license number, or the identification number from a Florida identification card issued under Florida law. Fla. Stat. § 97.053(5). If the applicant has not been issued a Florida driver license or a Florida identification card, then the applicant must provide the last four digits of the applicant's social security number.

Florida law requires that a voter registration application "may be accepted as valid only after the department has verified the authenticity or nonexistence of the Florida driver license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant." Fla. Stat. § 97.053(6)(a). If the Florida driver license, identification card, or last four digits of the social security number cannot be verified or the

[1] This version of the statute will become effective on January 1, 2027. Any substantive differences between the current and future versions of the statute are immaterial to the analysis.

"records of the Department of Highway Safety and Motor Vehicles indicate that the applicant is not a United States citizen" or "has not provided a document acceptable as evidence of United States citizenship," then "the applicant must be notified and must provide evidence to the supervisor sufficient to verify the authenticity" of the driver license, identification card, social security number, or evidence of citizenship (the "**Voter Identity Requirement**"). Fla. Stat. § 97.053(6)(a).

"If the applicant provides the necessary evidence, the supervisor must place the applicant's name on the registration rolls as an active voter." *Id.* If the necessary evidence is not provided or the number has not been verified prior to the date the applicant goes to vote, then the applicant is provided a provisional ballot. *Id.* The provisional ballot is counted only if the applicant "presents evidence to the supervisor of elections sufficient to verify the authenticity of the applicant's Florida driver license number, Florida identification card number, or last four digits of the social security number or, if applicable, presents a document acceptable as evidence of United States citizenship no later than 5 p.m. of the second day following the election." *Id.*

**C. Florida Rising Together, Inc.**

Florida Rising Together, Inc. is a not-for-profit corporation "dedicated to advancing economic and racial justice across Florida by building power in historically marginalized communities." It conducts "massive" voter registration programs in which it assists people with filling out paper voter registration applications. Florida Rising Together, Inc. alleges that paper registration applications are more likely to yield discrepancies with the federally-required database.

The confluence of Florida Rising Together, Inc.'s mission and its registration efforts results in Florida Rising Together, Inc. steering applicants "who predominantly identify as Black or non-white" towards the very scenario where discrepancies are most likely to exist between the federally-required information and the federally-required database. Unsurprisingly, Florida Rising Together, Inc. alleges that it has considerable experience with Florida's Voter Identity Requirement.

Florida Rising Together, Inc. believes that the Voter Identity Requirement has "frustrated a core component of Florida Rising Together's mission" and "interfer[ed] with its ability to register Floridans to vote." Rather than spending its time and resources searching for more Floridians to register, Florida Rising Together, Inc. alleges it must follow up with Floridians it already helped, and help those people more. Specifically, Florida Rising Together, Inc. alleges it must contact Floridians it previously helped fill out a paper application, inform them that evidence of identity is required, and help them submit that evidence.

In each of the counties with supervisors of elections named in this suit, Florida Rising Together, Inc. has been required to launch "outreach programs designed specifically to contact individuals" who must comply with Florida's Voter Identity Requirement. Doing this has required Florida Rising Together, Inc. to "deploy staff and other resources that would otherwise be devoted to the organization's core voter registration, voter education, and get-out-the-vote work." Ultimately, this "diversion of resources" has left Florida Rising Together, Inc. "unable to reach as many other potential registrants as it would otherwise be capable of reaching."

**D. Florida Rising, Inc.**

Florida Rising, Inc. is a 501(c)(4) "grassroots" nonprofit organization. Its mission is to "build independent political power" for "historically marginalized communities" and "everyday Floridians." Florida Rising, Inc. alleges that it is a "people-powered organization made up of members advancing economic and racial justice across Florida." It alleges that it has "more than 100,000 members," including "nearly 150 members" who were "currently in 'unverified' status" as of the filing of the First Amended Complaint. Florida Rising, Inc. also alleges that it has 289 "members" who were "previously unverified" but who "subsequently made it onto the voter rolls." Florida Rising, Inc. alleges that it includes in its membership people "who have been impacted" by the Voter Identification Requirement, as well as individuals who "are at risk of being impacted" by that requirement. Included among those alleged members are people Florida Rising, Inc. considers "eligible voter registration applicants who . . . have had or will in the future have their facially complete voter registration forms deemed 'unverified' and who, as a direct result of the [Voter Identification Requirement], will not be registered to vote." Florida Rising, Inc. does not allege how it determined which of its members are under this cloud. Whether the impact of the Voter Identity Requirement is in the past, present, or future, the 197 paragraphs of the First Amended Complaint do not include information from which any affected members of Florida Rising, Inc. could be identified.

**E. Secretary of State Cord Byrd**

Under the Florida Election Code, Secretary of State Cord Byrd is "the chief election officer of the state" charged with, among other things, "[e]nsur[ing] that all registration applications and forms prescribed or approved by the department are in compliance with the

Voting Rights Act of 1965 and the National Voter Registration Act of 1993," "[c]reat[ing] and administer[ing] a statewide voter registration system as required by the Help America Vote Act of 2002," "[p]rovid[ing] uniform standards for the proper and equitable implementation of the registration laws by administrative rule of the Department of State," and "[c]onduct[ing] preliminary investigations into any irregularities or fraud involving voter registration." Fla. Stat. § 97.012.

**F. Other States**

While HAVA requires every state to collect the federally-required information and compare it against the federally-required state databases, Florida Rising Together, Inc. and Florida Rising, Inc. allege that not every state has something like Florida's Voter Identity Requirement. Florida Rising Together, Inc. and Florida Rising, Inc. contend that in Pennsylvania, Georgia, and Ohio, for example, the state registers an applicant to vote even if the federally-required information does not match the federally-required database. Florida Rising Together, Inc. and Florida Rising, Inc. think Florida should follow the example that Pennsylvania, Georgia, and Ohio provide.

**G. The Relief Requested**

Florida Rising Together, Inc., on its own behalf, and Florida Rising, Inc., on behalf of its members, seek declaratory and injunctive relief to stop Florida's Secretary of State and thirteen of Florida's supervisors of elections from enforcing the Voter Identity Requirement. Specifically, the First Amended Complaint seeks a declaratory judgment that the Voter Identity Requirement results in delays or rejection of applications from otherwise-eligible Floridians, which "violates (a) the fundamental right to vote under the First and Fourteenth Amendments

to the United States Constitution and (b) Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301." It further seeks a declaratory judgment that the Voter Identity Requirement violates Section 8 of the National Voter Registration Act of 1993, 52 U.S.C. § 20507.

The Amended Complaint also seeks a permanent injunction ordering that: (1) the Secretary must discontinue the use of Florida's Voter Identity Requirement, at least insofar as it results in Florida Rising, Inc. members and voter applicants registered by Florida Rising Together, Inc. being placed in "unverified" status, in Broward, Duval, Gadsden, Hillsborough, Leon, Miami-Dade, Orange, Osceola, Palm Beach, Pinellas, Polk, Seminole, and Volusia Counties; (2) the defendant supervisors of elections must permit Florida Rising, Inc. members and those Floridians assisted by Florida Rising Together, Inc. to be allowed "to vote and have their ballots counted unless Defendants have or obtain other, independent evidence that casts doubt on the voter's identity or eligibility to vote"; (3) the defendant supervisors of elections must "place otherwise eligible applicants who are Florida Rising members or who have been registered by Florida Rising Together on the voter rolls" into "active status even if their voter registration application" triggered the Voter Identity Requirement, "absent some other, independent evidence that casts doubt on the applicant's identity or eligibility to vote"; (4) the Secretary and the defendant supervisors of elections must provide notice to voters of the relief this Court orders; and (5) all defendants maintain, preserve, and not destroy until after December 31, 2026, "any and all records relating to Florida's voter-registration verification program under § 97.053(6)."

### H. Ms. Bach

The First Amended Complaint identifies Suzan Hammack Bach as "an example of how a voter can become ensnared by" the Voter Identity Requirement. Ms. Bach is not alleged to be (1) a "member" of Florida Rising, Inc.; (2) a person assisted by Florida Rising Together, Inc.; or (3) a "person of color." However, she is over the age of 65 and a "resident of Duval County" residing "outside the United States," who submitted a voter registration application in late July 2024. (Doc. # 105, pp. 32–34 ¶¶ 104–113.) Her application was processed promptly but the information she provided did not match Florida's records, so she was contacted and required to provide evidence of her identity. The choice of words in the First Amended Complaint leaves it unclear when Ms. Bach was first contacted, but Ms. Bach was provided notification "again" on July 30, 2024. The First Amended Complaint does not allege what the reasons were for the delay, but about a month later, Ms. Bach spoke with an Assistant Elections Officer for Duval County. The First Amended Complaint does not allege why, but Ms. Bach was "provided instructions for completing an additional voter registration form." The First Amended Complaint does not allege that "an additional [federal postcard application]" is what Ms. Bach was directed to provide, but it does allege that Ms. Bach submitted one and that it was processed on September 6, 2024, and marked as unverified on September 9, 2024.

The First Amended Complaint does not say why Ms. Bach thought these things would be adequate, but it alleges that on September 13, 2024, "Ms. Bach provided Ms. Johnson with three forms of identification: her passport, a letter from SSA, and a bank account letter." (Doc.

# 105, p. 32 ¶ 107.) On September 18, 2024, Ms. Johnson told Ms. Bach she would need to provide an image of her social security card. (*Id.* at ¶ 107.)

For reasons the First Amended Complaint does not allege, rather than submit the documentation Ms. Johnson requested when she requested it, Ms. Bach waited about a month and then simply sent another federal postcard application to Ms. Johnson via email. (*Id.* at ¶ 108.) That very same day, Ms. Johnson responded to Ms. Bach that she must provide a copy of her social security card, a Florida driver license, or a Florida identification card. (*Id.*)

A few weeks later, an attorney for Ms. Bach emailed Ms. Johnson on October 27, 2024. (*Id.* at ¶ 109.) The attorney told Ms. Johnson that it was "improper" for Ms. Johnson to request that Ms. Bach provide a social security card because Ms. Bach's age and overseas status exempted her from those requirements. (*Id.*) The attorney demanded that Duval County issue Ms. Bach an absentee ballot. (*Id.*)

Within two days, Ms. Johnson responded to Ms. Bach's attorney with a letter from the City of Jacksonville's general counsel and Division of Elections Director explaining that Ms. Bach "must still provide necessary information before she is able to vote." (*Id.* at ¶ 110.) Ms. Bach's attorney attempted to negotiate this requirement by offering to submit a copy of Ms. Bach's passport application. (*Id.*)

Ms. Bach evidently never provided a copy of her social security card. Even so, two days before the election, her attorney provided Ms. Johnson with a tax return that displayed Ms. Bach's social security number. (*Id.* at ¶ 111.) Ms. Johnson responded that same day, expressing optimism that the tax return would be sufficient. (*Id.*) On November 5, 2024 (Election Day), an employee from VoteFromAbroad.org emailed Ms. Johnson on behalf of

Ms. Bach. (*Id.* at ¶ 112.) By this point Ms. Bach "had previously submitted a Federal Write-in Ballot," and Ms. Johnson ultimately emailed Ms. Bach a General Election Ballot and told her that "she had been made an eligible voter in Duval County." (*Id.*)

Although she was registered to vote without being required to provide a copy of her social security card and was able to vote by federal write-in ballot, Ms. Bach still self-identifies as "partially disenfranchised" because "she was unable to open the email ballot" that was sent to her on election day. (*Id.* at ¶¶ 111–12.) She "was, and remains, upset" about the fact that she was unable to vote in Florida statewide ballot initiatives that "were personally important" to her. (*Id.* at ¶ 113.)

## III. Legal Standard

Under Rule 12(b) of the Federal Rules of Civil Procedure, a defendant is entitled to dismissal if, among other things, the complaint fails to establish the Court's subject matter jurisdiction or fails to state a claim. An attack under Rule 12(b)(1) can be facial or factual; either way, the motion challenges the Court's power to adjudicate the case. A motion under Rule 12(b)(6) simply alleges that the complaint on its face fails to state a claim.

If the motion is made under Rule 12(b)(1) or 12(b)(6), the Court considers only the allegations of the complaint. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–36 (11th Cir. 2013) ("Facial attacks to subject matter jurisdiction require the court merely to look and see if the plaintiff's complaint has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion."). In this way, the legal standard applied to a facial attack on subject matter jurisdiction under Rule 12(b)(1) is the same as the legal standard applied to a motion to dismiss for failure to state a

claim under Rule 12(b)(6). *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) ("Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint. When considering such challenges, the court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true."). If the motion makes a factual attack, the Court will (1) go beyond the complaint, (2) consider extrinsic evidence, and (3) not be constrained to view the facts in the light most favorable to the plaintiff. *Houston*, 733 F.3d at 1336.

When considering either a facial attack to its jurisdiction under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6), *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) require that the Court differentiate between those parts of the complaint that are truly allegations of fact and those parts of the complaint that, even if couched as facts, are legal conclusions. If a statement in the complaint is a factual allegation, the Court must accept it as true for the purposes of the motion, and all reasonable inferences from the factual allegation are drawn in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678. However, if the statement in the complaint is a legal conclusion, it is not appropriate for the Court to accept the statement as true. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."). If the complaint alleges insufficient facts to support a statement that is a legal conclusion, the legal conclusion may be disregarded. *Id.* A statement is considered a legal conclusion if the statement can be

determined as true only if facts are applied to a legal standard. *See generally Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982).

The requirement that factual allegations be plausible does not mean that factual allegations must be inordinately detailed, but factual allegations are not plausible if they are merely "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678. All in all, "the 'factual allegations must be enough to raise a right to relief above the speculative level.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555) (citation modified).

A facial 12(b)(1) challenge gives a plaintiff "safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). It "require[s] the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* (citations and quotations omitted).

## IV. Discussion

Secretary Byrd moves to dismiss the First Amended Complaint under both Rule 12(b)(1) and Rule 12(b)(6). As the grounds for his 12(b)(1) challenge, the Secretary argues that on the face of the First Amended Complaint neither Florida Rising Together, Inc. nor Florida Rising, Inc. has established a basis for Article III standing. The plaintiffs disagree. Florida Rising, Inc. contends that the First Amended Complaint adequately alleges a basis for associational standing. Florida Rising Together, Inc. contends that it has sufficiently alleged standing in its own right.

### A. General Principles of Standing

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). A standing inquiry "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Id.* In both senses, a standing analysis "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Id.*

The Constitution gives federal courts the power to hear only "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. This Article III judicial power "exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Id.* at 499. For that reason, "[a] federal court's jurisdiction can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .'" *Id.* "Generalized grievances," which are "shared in substantially equal measure by all or a large class of citizens," are typically insufficient to warrant the exercise of Article III judicial power. *Id.* "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" because "[w]ithout such limitations . . . the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id.* at 499–500.

A proper focus on the constitutional and prudential dimensions of standing ensures that federal courts act only "as a necessity in the determination of real, earnest and vital"

disputes. *Muskrat v. United States*, 219 U.S. 346, 359 (1911) (internal quotation marks omitted). Indeed, "[t]he province of the court is, solely, to decide on the rights of individuals." *Marbury v. Madison*, 5 U.S. 137, 170 (1803). This judicial "power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law." *Osborn v. Bank of U.S.*, 22 U.S. 738, 819 (1824). So, "[t]o state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). "The law of Article III standing . . . is built on separation-of-powers principles [and] serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). A would-be plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

An organizational plaintiff may establish Article III standing in two ways. It may assert (1) standing "as the representative of its members" ("associational standing") or (2) standing on its own behalf as an organization ("organizational standing"). *Warth*, 422 U.S. at 511. Here, Florida Rising, Inc. contends that it has associational standing and Florida Rising Together, Inc. contends that, as an organization, it has standing under a "diversion of resources" theory. Each will be discussed in turn.

**B. Associational Standing**

"An organization may vindicate the rights of its members by suing on their behalf." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 771 (11th Cir. 2024). To establish associational standing, an organizational plaintiff must allege in its complaint

sufficient facts from which the Court could conclude that "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

To determine whether a member of an organization has standing in his or her own right, a court must determine whether the member (1) suffered an injury-in-fact that is (2) both fairly traceable to the defendant's conduct and (3) redressable by the requested relief. *Fearless*, 103 F.4th at 772. "To qualify for injury-in-fact status, a plaintiff's injury must be '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.*

A challenge to associational standing can be facial (when the identity of members cannot be determined from the face of the complaint) or factual (when there is a dispute about whether the identified individuals are, in fact, members). *See Hunt*, 432 U.S. at 341–45 (evaluating an organization's "indicia of membership" to determine if industry producers and dealers were members of state-created organization); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (applying *Hunt*'s indicia to statutory governance structure); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (holding that the organization lacked standing because it "failed to submit affidavits showing, through specific facts, that one or more of its members would be directly affected by the allegedly illegal activity.") (citation modified).

Naming the affected members is "required" except where "*all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498–99 (emphasis in original). The Supreme Court has specifically rejected the practice of "accepting an

organization's self-description of its membership" even when no one challenges that description because "it is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Id.* at 499 (citation modified). As a matter of pleading, an organization asserting associational standing must plead sufficient facts for the Court to identify the affected members for the purpose of determining whether each of those members "would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. If the allegations contained in the pleading are insufficient, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth*, 422 U.S. at 501.

Like any other plaintiff, an organization asserting associational standing bears the burden of establishing the Court's Article III jurisdiction at every stage of the case. Standing is determined "as of the time the complaint was filed." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1281 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 607 (2025). The organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm," *Summers*, 555 U.S. at 498, and "the threatened injury . . . [must be] sufficiently imminent" and remain a "cognizable danger" that "serves to keep the case alive" at every stage of the litigation. *Cambridge Christian*, 115 F.4th at 1283.

"At every stage of the litigation" means that the plaintiff is required to sustain a posture that demonstrates that future injury to it is "certainly impending" to occur, no matter how long the case is pending. *Id.* at 1281; *see id.* at 1283 (determining that a plaintiff could not show that a future injury was "certainly impending" when, after nine years of litigation over the 2016

State championship game, it had not returned to the State championship a second time). In an associational standing case, this means that the organization must establish that its members' claims have not become moot since the case was filed, or otherwise failed to sustain a posture that reflects the impending and substantial likelihood that future injury awaits.

Florida Rising, Inc. asserts that it has associational standing because the First Amended Complaint concludes that Florida Rising, Inc.'s members are (or one day could be) injured by the Voter Identity Requirement. But Florida Rising, Inc. is a corporation and Florida law governs who is a member of a corporation. This makes Florida Rising, Inc.'s allegation that it has members a legal conclusion, not a factual allegation. And because it is not a factual allegation, the statement that Florida Rising, Inc. has members is not accepted as true for the purposes of the motion.

To be clear, a Florida corporation can have members. Fla. Stat. § 617.0601(1)(a). But if a Florida corporation has members, "the qualifications and rights of the members of each class, any quorum and voting requirements for meetings and activities of the members, and notice requirements sufficient to provide notice of meetings and activities of the members must be set forth in the articles of incorporation or in the bylaws." *Id.* Looking at the factual allegations of the First Amended Complaint, Florida Rising, Inc. did not include sufficient facts from which the Court can conclude that the corporation has members for the purposes of associational standing.

Florida Rising, Inc. argues that the Court must accept its "good faith" representations without "further scrutiny into how the organization operates." It cites *Students for Fair Admissions* ("*SFFA*") for this point. *Students for Fair Admissions, Inc. v. President & Fellows of*

*Harvard Coll.*, 600 U.S. 181 (2023). *SFFA* is distinguishable, though. In that case, the record below established that the organization was "a validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission." *Id.* at 201 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 184 (1st Cir. 2020), *rev'd*, 600 U.S. 181 (2023)). The record included SFFA's bylaws, which enabled a determination whether a purported member was a member under the bylaws and state law. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 105–06 (D. Mass. 2017), *aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, *rev'd*, 600 U.S. 181 (2023). At the trial court, the plaintiff produced declarations of its members that reflected "they have voluntarily joined SFFA; they support its mission; they receive updates about the status of the case from SFFA's President; and they have had the opportunity to have input and direction on SFFA's case." *Students for Fair Admissions, Inc.*., 600 U.S. at 201 (citation and quotations omitted). None of this is true with Florida Rising, Inc., which makes this case distinguishable.

Florida Rising, Inc. will be granted leave to amend, consistent with Rule 11, to address this issue. When it amends, Florida Rising, Inc. should note that although the Eleventh Circuit has not imposed "a requirement that an organizational plaintiff identify affected members by their legal names," *Fearless*, 103 F.4th at 773, a plaintiff bears the burden of satisfying the court that it has subject matter jurisdiction at every stage of the litigation. The level of specificity required necessarily depends on the nature of the injury-in-fact alleged. Here, to satisfy the Court that it has subject matter jurisdiction, Florida Rising, Inc. must allege sufficient facts for

the Court to determine that the members of Florida Rising allegedly injured by the Voter Identity Requirement have standing to sue in their own right, at every stage of the litigation.

The Court's ability to assess from the face of the pleading that Florida Rising's members have standing in their own right is particularly important, given the nature of the allegations in the First Amended Complaint. The First Amended Complaint identifies Ms. Bach as a prime example of the injury a voter registration applicant suffers due to Florida's Voter Identity Requirement. But the factual allegations about Ms. Bach raise the immediate question whether, two years into this case, any members of Florida Rising, Inc. who had standing when this case was filed would still have standing today. After all, the First Amended Complaint alleges that Ms. Bach's "unverified" status was resolved in four months, even without any assistance from Florida Rising, Inc. or Florida Rising Together, Inc.

Contrast the nature of the injury alleged in the First Amended Complaint to the nature of the injury in *Fearless*. The injury to the organization's members in *Fearless* was tied to the fact that they were not black, because the organization's members wanted to compete in a competition exclusively open to black women. *Id.* at 772. Race and gender are immutable characteristics. If one of the organization's members was not a black female on the day the case was filed, then that member was still not a black female at the end of the case, no matter how long the case took to resolve. Since the nature of the alleged injury was tied to an immutable characteristic, a less detailed identification of the members was necessary to assess standing as an ongoing matter.

The nature of the alleged injury here is not tied to an immutable characteristic. Although Florida Rising, Inc. alleges that Florida's Voter Identity Requirement has a disparate

impact on minorities, the nature of the alleged injury to Florida Rising, Inc.'s members is tied to voter registration status, not race. Unlike an immutable characteristic, a person's voter registration status can change. The allegations about Ms. Bach show this, as does Florida Rising, Inc.'s allegation that it has 289 members who were "previously unverified."

When the Voter Identity Requirement is triggered, seemingly all it takes to move a person from "not registered" to "registered" is "evidence . . . sufficient to verify the authenticity" of a person's driver license, identification card, social security number, or evidence of citizenship. Fla. Stat. § 97.053(6)(a). Perhaps finding a way to photocopy your driver's license at Kinko's one time in two years is more onerous than it sounds. If so, certainly Florida Rising, Inc. should have an opportunity to explain how.

Meanwhile, a plaintiff who had standing on the day a case was filed may not have standing years later. *See Cambridge Christian*, 115 F.4th at 1283. If an organization derives its standing from the standing of its members, then it must identify those members in sufficient detail for the Court to determine that the members had standing at the time the case was filed and maintained that standing at every stage of the case.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth*, 422 U.S. at 498. Subject matter jurisdiction goes to the heart of a federal court's power to adjudicate the case, *see, e.g.*, *Stalley ex. rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1234–35 (11th Cir. 2008), and the requirement that the Court's jurisdiction be established is "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

As the party seeking to invoke the Court's jurisdiction, it is Florida Rising, Inc.'s burden to satisfy the Court of its power to adjudicate, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 333 (2006), and the Court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). The Court is obligated to assess Florida Rising, Inc.'s standing at every stage of the case, and because Florida Rising, Inc.'s standing depends on the standing of its alleged members, it is necessary for those members to be identified in a manner that allows the standing of those members to be evaluated at every stage of the case, too. *See United States Postal Serv. v. California*, 609 U.S. ____, (Sept. 14, 2026) (Alito, J., dissenting) (slip op., at *3) ("organizations . . . assert[ing] associational standing based on injuries to unnamed members who never filed declarations themselves" do not show standing).

Even if Florida Rising, Inc.'s arguments about standing had merit (they do not), Florida Rising, Inc. was obligated to identify its injured members one way or the other. Under Rule 3.03 of the Local Rules of the Middle District of Florida, Florida Rising, Inc. was required to "identify" all non-party, non-attorney "natural persons" "with an interest the action's outcome might substantially affect." Rule 3.03, Local Rules of the Middle District of Florida. Florida Rising, Inc. filed a disclosure statement (Doc. # 160), but it decided the requirement to "identify" natural persons did not require disclosure of names. Since an object of the disclosure is to assist the Court with assessing its conflicts, this construction of "identify" seems odd. Then, on the next page of its disclosure, Florida Rising, Inc. reverts to a more traditional construction of "identify." There, the lawyers got named and Florida Rising, Inc. even named their law firms. (Doc. # 160 at 2.) Whatever reasoning led Florida Rising, Inc.

to conclude that "identify" only means to name someone if they have a law degree, Florida Rising, Inc.'s disclosure is due to be stricken. Florida Rising, Inc. will be required to amend its disclosure. In its amended disclosure, Florida Rising, Inc. will identify any natural persons "with an interest the action's outcome might substantially affect" by name and address. For avoidance of doubt, if there are members of Florida Rising, Inc. from whom the organization allegedly derives its standing, then Florida Rising, Inc. must also include in its disclosure the address the member listed on his or her voter registration application.

In sum, the First Amended Complaint is due to be dismissed because Florida Rising, Inc. did not carry its burden to sufficiently allege a basis for this Court to conclude that Florida Rising, Inc. has standing. Leave to amend is granted and if Florida Rising, Inc. amends the complaint, it must satisfy the Court that it has Article III jurisdiction. To do this, the factual allegations of the complaint must be sufficient for the Court to assess that (1) Florida Rising, Inc. has members and (2) those members have standing in their own right at every stage of the litigation.

**C. Organizational Standing**

Florida Rising Together, Inc. argues it has sufficiently alleged standing in its own right based on a "diversion of resources" theory. It contends that the First Amended Complaint meets the minimum standard to show organizational standing based on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). For the reasons discussed here, Florida Rising Together, Inc. is wrong. As the Supreme Court recently noted, *Havens Realty* was an unusual case and Florida Rising Together, Inc.'s "diversion of resources" theory extends further than *Havens Realty* can bear, especially after *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 370 (2024).

In *Havens Realty*, the organizational plaintiff was a nonprofit corporation organized under the laws of the Commonwealth of Virginia "to make equal opportunity in housing a reality in the Richmond Metropolitan Area." *Havens Realty*, 455 U.S. at 368. "According to the complaint, [the organizational plaintiff]'s membership was 'multi-racial and included approximately 600 individuals.'" *Id.* It provided "the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." *Id.* The individual plaintiffs, testers for the organizational plaintiff, contended that the defendant, Havens Realty, practiced racial steering. *Id.* The organizational plaintiff contended that it was injured because Havens Realty's steering practices "frustrated the organization's counseling and referral services, with a consequent drain on resources" and "its members had been deprived of the benefits of interracial association arising from living in an integrated community free of housing discrimination." *Id.* at 369. The district court dismissed the complaint for lack of standing. *Id.*

Applying the legal standard that predated *Ashcroft* and *Iqbal*, the Fourth Circuit reversed on the basis that "the organization's allegations of injury to itself and its members were sufficient, at the pleading stage, to afford the organization standing both in its own capacity and as a representative of its members." *Id.* at 370.

Explicitly rooting its standing inquiry in another Fair Housing Act case construing the same version of § 812 of the Fair Housing Act, the Court began from the premise that "the sole requirement for standing to sue under § 812 is the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and

palpable injury.'" *Havens Realty*, 455 U.S. at 372 (citing *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979)).

Section 812 of the Fair Housing Act of 1968 must be understood within the context of its passage, some of which is described in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project*, 576 U.S. 519, 529–30 (2015). After "a period of considerable social unrest" in the mid-1960s, President Lyndon Johnson established a commission, which "identified residential segregation and unequal housing and economic conditions in the inner cities as significant, underlying causes of the social unrest." *Id.* at 529. "Rapid urbanization, concomitant with the rise of suburban developments accessible by car, led many white families to leave the inner cities," which "often left minority families concentrated in the center of the Nation's cities." *Id.* at 528. In that era, "various practices were followed, sometimes with governmental support, to encourage and maintain" segregation, including racially-restrictive covenants, steering by real estate agents, and discriminatory lending practices. *Id.* at 528–29. President Johnson's commission concluded that America was "moving toward two societies, one black, one white—separate and unequal." *Id.* at 529 (internal citations omitted). To reverse the racial division, the commission recommended "a comprehensive and enforceable open-occupancy law making it an offense to discriminate in the sale or rental of any housing . . . on the basis of race, creed, color, or national origin." *Id.* at 529–30.

When Martin Luther King, Jr. was assassinated, "the Nation faced a new urgency to resolve the social unrest in the inner cities." *Id.* at 530. Congress responded by adopting the Fair Housing Act, which was enacted a week after Dr. King's assassination. *Id.*

In § 812 of the Fair Housing Act of 1968, Congress explicitly provided that "[t]he rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts *without regard to the amount in controversy* and in appropriate State or local courts of general jurisdiction." *Havens Realty*, 455 U.S. at 372 n.11 (emphasis added). This text was interpreted to mean that the Fair Housing Act of 1968 could be enforced by a third party.[2]

Both *Gladstone* and *Havens Realty* considered the private right of action in the 1968 version of § 812. *Gladstone* recognized that, grammatically, the text of that version of § 812 was "phrased in the passive voice" and by its plain language did not require that a private right of action be brought by "persons aggrieved." *Gladstone*, 441 U.S. at 102. In fact, the *Gladstone* Court concluded that Congress's choice of words in the text of § 812 made standing under that section "as broad as is permitted by Article III of the Constitution." *Id.* at 109 (citation modified).

Just as § 812(a) of the Fair Housing Act of 1968 was written so expansively that it created a private right of action without requiring that the plaintiff personally be aggrieved, § 812(c)'s damages provision was similarly expansive. Under § 812(c), the court could "grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000

[2] In the years that followed the Supreme Court's *Havens Realty* decision, Congress amended the Fair Housing Act to limit its private right of action to enforcement by "[a]n aggrieved person." *See* Pub. L. 100-430, § 8(2); *compare* 42 U.S.C. § 3613(a)(1)(A) (1988) (permitting "[a]n aggrieved person" to bring a private right of action) *with* 42 U.S.C. § 3612 (1968) ("The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction.").

in punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff." 42 U.S.C. § 812(c) (1968). The plain and ordinary meaning of that text is clear: in enacting the Fair Housing Act of 1968, Congress incentivized claims to be brought under the Act, if the Act was violated. Within that context, when the *Havens Realty* Court considered the organizational plaintiff's allegation that it was required to "to devote significant resources to identify and counteract" defendants' violations of the Fair Housing Act, the "drain on the organization's resources" theory was advanced in relation to a statute where Congress provided (1) a private right of action, (2) that was so expansive that it was available even to persons not aggrieved by a violation of the Fair Housing Act, and further provided (3) a private remedy, which (4) included monetary damages authorized in § 812. *Id.* at 379. Even then, the Court considered the need for the organizational plaintiff "to demonstrate at trial that it has indeed suffered impairment in its role of facilitating open housing before it will be entitled to judicial relief." *Id.* at 379 n.21.

Without this historical and legal context, it might have seemed like splitting hairs to begin the analysis by noting that Florida Rising Together, Inc.'s claims are not rooted in § 812 of the Fair Housing Act. But once *Havens Realty* is contextualized in this way, it is clearer why a unanimous United States Supreme Court began its analysis of standing in *Alliance for Hippocratic Medicine* by referring to third-party standing under the Fair Housing Act as "[t]he relevant question" in *Havens Realty*. 602 U.S. at 395. Indeed, (1) the unique nature of the private right of action that could be brought by basically anyone, (2) the existence of a private remedy, and (3) statutory text that permitted a claim for damages to be brought even by a person not aggrieved by a Fair Housing Act violation all explain why *Havens Realty* was such

"an unusual case" that the Court has since been unwilling "to extend . . . beyond its context." *Id.* at 395–96.

*Alliance for Hippocratic Medicine* nods to these issues. In that case, the plaintiff medical organizations claimed standing based on a diversion of resources theory, citing to *Havens Realty*. 602 U.S. at 395. Specifically, the plaintiff organizations claimed that the FDA's relaxation of requirements relating to mifepristone required them to divert their resources and time away from treating other patients and subjected them to increased risk of liability suits and rising insurance costs. *Id.* at 390.

The Supreme Court referred to third-party standing under the Fair Housing Act as "[t]he relevant question" in *Havens Realty*. *Id.* at 395. It rejected the idea that any organization can "manufacture its own standing" by diverting its resources "in response to a defendant's actions." *Id.* at 394–95. It explained that an organization cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394; *see also United States Postal Serv.*, 609 U.S. ____ , (Alito, J., dissenting) (slip op. at *2–3) ("[A] rule supposedly thwart[ing] [an organization's] ability to educate members about voting . . . is based on 'a setback to the organization's abstract social interests' and an effort to 'spend its way into standing simply by expending money to gather information and advocate against the defendant's action[s].'") (quoting *All. for Hippocratic Med.*, 602 U.S. at 394).

After referring to standing under the Fair Housing Act as "[t]he relevant question" posed by *Havens Realty*, the *Alliance for Hippocratic Medicine* Court reasoned that a "diversion of resources" argument must contemplate some connection between (1) the injury the organization alleged in its complaint and (2) a cause of action recognized under the law. 602

U.S. at 390–91. Although brought under the Administrative Procedure Act as a challenge to the lawfulness of the FDA's approval of a drug, *id.* at 376, the root of the organizations' claim was the Federal Food, Drug, and Cosmetic Act (FDCA) and the Pediatric Research and Equity Act (PREA). *See All. for Hippocratic Med.*, 2:22-cv-223, 2022 WL 17091784 (complaint).

The Supreme Court has "a particular understanding of the genesis of private causes of action." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Id.* To understand the genesis of a private cause of action, the Supreme Court first asks whether Congress passed a statute that creates a private right. *Id.* If the answer is yes, then it asks whether the statute *also* creates a private remedy. *See id.* ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."). "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Id.* at 287; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (discussing the second prong of judicial review under 5 U.S.C. § 702, which requires "the plaintiff [to] establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint").

When *Alliance of Hippocratic Medicine* discussed the physicians' diversion of resources claim and pointed out that "the law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries," it is important to

recognize that neither the FDCA nor the PREA create a private right of action or a private remedy. *All. for Hippocratic Med.*, 602 U.S. at 391; *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) ("The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance.") (citing 21 U.S.C. § 337(a)). Indeed, the physician-plaintiffs in *Alliance for Hippocratic Medicine* sought relief under a statute enforceable only in the name of the United States.

The opinion includes other allusions to the need for a private right of action and private remedy that includes a claim for damages to sustain standing based on a diversion of resources theory. For example, it observed that if "EPA rolls back emissions standards for power plants" a doctor does not "have standing to sue because she may need to spend more time treating asthma patients." *Id.* at 391. There is a private right of action available under 42 U.S.C. § 7604(a), but that private right of action does not authorize an award of damages, consequential or otherwise. *See, e.g.*, *GreenLatinos v. Suncor Energy (U.S.A.)*, 184 F.4th 1171, 1181 (10th Cir. 2026) ("Although compensatory damages are generally understood to not be available under citizen suit provisions, plaintiffs can seek equitable relief and extract civil penalties to deter pollution.") (internal citations omitted). The rollback of emissions standards does not give a doctor standing to sue because if diversion of resources is a redressable injury, it is redressable in the form of consequential damages. *Consequential Damages*, *Black's Law Dictionary* (12th ed. 2024) (defining consequential damages as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act"). Since Congress did not provide damages as a remedy available under the statute, it makes sense that a doctor cannot base his or her standing on the need for that remedy.

Returning to Florida Rising Together, Inc.'s First Amended Complaint, no claim alleged there is based on a private right of action that allows a person who is not "the person injured" to make a claim for monetary damages. Counts I and III purport to state claims under 42 U.S.C. § 1983 for violation of the right to vote and violation of the Voting Rights Act. Damages are an available remedy under § 1983, but § 1983 only makes damages available "to the party injured" and, in any event, Florida Rising Together, Inc. does not demand monetary damages in the First Amended Complaint. Its prayer for relief is limited to equitable relief in the form of a declaratory judgment and an injunction. Without a claim for money damages, any evidence of "diversion of resources" is not relevant to Florida Rising Together, Inc.'s § 1983 claims.

Count II runs into a different problem, because it purports to bring a claim under a statute that does not authorize a private right of action. 52 U.S.C. § 20507(b)(1) simply provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." Florida Rising Together, Inc. did not allege a claim under 52 U.S.C. § 20510(b)(1), which does provide a private right of action, but even if it had, that right of action belongs only to "a person who is aggrieved by a violation" of the Voting Rights Act.

In sum, the allegations of the First Amended Complaint do not satisfy the Court that Florida Rising Together, Inc. has standing to pursue a claim in its own right. For that reason, the First Amended Complaint is due to be dismissed as to Florida Rising Together, Inc., with leave to amend.

## V. Conclusion

Florida Rising, Inc. has failed to demonstrate associational standing and Florida Rising Together, Inc. has failed to establish organizational standing. The Amended Complaint is due to be dismissed without prejudice, with leave to amend on or before October 15, 2026. In the meantime, the plaintiffs' disclosure statement (Doc. # 160) is stricken and the plaintiffs must amend in compliance with Local Rule 3.03 on or before October 5, 2026.

Accordingly, it is now

**ORDERED** and **ADJUDGED** that:

1. The Secretary's Motion to Dismiss (Doc. # 148) is **GRANTED**;

2. The First Amended Complaint is **DISMISSED** and the Clerk is directed to **CLOSE** this file. If the plaintiffs timely amend their complaint, the Clerk is directed to reopen the file without the need for further order;

3. If they can do so consistent with Rule 11 of the Federal Rules of Civil Procedure, the plaintiffs are granted leave to amend on or before October 15, 2026;

4. The Intervenors' Motion to Dismiss (Doc. # 145) is **DENIED** because the issues contained in it cannot be reached until the plaintiffs have satisfied the Court that it has jurisdiction; and

5. The plaintiffs' disclosure statement (Doc. # 160) is **STRICKEN** with directions to comply with Middle District of Florida Local Rule 3.03 no later than October 5, 2026.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this 29th day of September, 2026.

**ANNE-LEIGH GAYLORD MOE**
UNITED STATES DISTRICT JUDGE

**<u>Copies to:</u>**

All counsel of record